[No. 63579-4-I. Division One. October 8, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. IVORY BERUBE, *Appellant*.

*Eric Broman* (of *Nielsen, Broman & Koch, PLLC*), for appellant.

Daniel T. Satterberg, *Prosecuting Attorney*, and *Brian M. McDonald, Deputy,* for respondent.

¶1 ELLINGTON, J. — Reference to a "snitch code" in closing argument, when supported by the evidence and not accompanied by racial comments, is not prosecutorial misconduct. Nor does a prosecutor commit misconduct by arguing that the defendant tailored his account of events in response to other witnesses' testimony where the argument is based on defendant's testimony on direct examination. We reject Ivory Berube's challenges to his convictions and affirm.

## FACTS

¶2 On the night of July 11, 2008, Tanisha Barquet and Kyla Jackson went to Thompson's Point of View, a Seattle nightclub located at 23rd and Union. Outside the nightclub, Ivory Berube's brother Emory[1] approached Barquet and accused her of being involved in the shooting of his friend "Clips."[2]

¶3 As Barquet later testified, Emory threatened her, called her names, and then made several calls on his cell phone, telling her he was going to call Clips. Barquet decided to leave. Before she did so, she saw Clips and Berube join Emory. Berube put something "in his waistband."[3] He approached her and noticed the "Ms. Barquet" tattoo on her arm. He asked her if she was a Barquet and

---

[1] To avoid confusion, we refer to Emory Berube by his first name and Ivory Berube by his last.

[2] Also referred to as "E Clips" or "Eclipse." His real name is Diantre Jefferson. He had been shot in June 2008.

[3] Report of Proceedings (RP) (Apr. 16, 2009 a.m. session) at 38.

remarked that he had grown up with her family. His manner was not hostile or threatening.

¶4 Barquet and Jackson left Thompson's and visited two other bars in the area. Eventually Barquet joined another friend, Alysha Johnson, and they drove to Waid's, a Haitian restaurant near Jefferson Street and 12th Avenue. Waid's was closing, and people were outside in the street, including the Berube brothers.

¶5 The Waid's security video shows the brothers noticing Barquet's arrival.[4] They separate, and the crowd draws away. Berube steps into the street and makes a motion as if racking a handgun. As Emory yells at Barquet, Berube moves out of camera range in Barquet's direction. Then Barquet runs past Waid's in the other direction and goes out of camera range and people run back inside Waid's. Two minutes later, police arrive.

¶6 Barquet's memory of what happened is hazy. She remembers "[a] lot of commotion, a lot of people yelling" as she crossed the street after getting out of Johnson's car.[5] She heard a gunshot and felt pain in her head. She turned around and saw Berube about six or eight feet away, pointing a gun at her. She ran, and Berube shot her in the leg. She suffered life-threatening wounds to a vein and her femoral artery, and her ear had to be reconstructed.

¶7 Joseph Burgess was driving on Jefferson Street and heard the gunfire. He parked and was attempting to call 911 when he saw someone "running with a purpose" past his car.[6] He saw "something going on at the waistband" of this individual, like a "gun, or something shaped like a banana."[7]

---

[4] The video is grainy and blurred. Our description is taken from the prosecutor's unchallenged statements as the video was shown to the jury during closing argument. *See* RP (Apr. 23, 2009) at 16-18.

[5] RP (Apr. 16, 2009 a.m. session) at 49.

[6] RP (Apr. 16, 2009 p.m. session) at 36.

[7] *Id.* at 38.

¶8 Police responding to the scene were advised the suspected shooter was a black male in his 20s wearing a white T-shirt, white baseball cap, and black jeans and possibly wearing glasses, running north on 13th Avenue. Officers stopped a car occupied by Charles Justice a few blocks southeast of the scene. Justice attempted to flee on foot but was subdued by a stun gun. Police later found two semiautomatic weapons in the car.

¶9 On July 14, 2008, Detective James Cooper showed Barquet a photomontage that included Justice's photograph. Barquet stated she knew Justice and he was not the person who shot her. Shown two more photomontages, she identified Emory as the person who had confronted her outside Thompson's and Berube as the person who shot her. Burgess also picked Berube from a photomontage as the person who ran past his car, though he could not identify him with certainty.

¶10 On July 17, 2008, police arrested Emory. The next day, Emory made several phone calls to Berube from the jail. Calls from the jail are recorded. Among other things, they talked about the possibility of Emory's arrest being the result of an informant talking to police, about the officers telling Emory they had seen the Waid's video and knew he was not the shooter, and about Berube being "in the wind."[8] Berube said, "I'm gone tonight."[9]

¶11 Berube took a bus to New Bedford, Massachusetts. He was arrested there at his mother's house on July 28, 2008.

¶12 Detectives advised Berube of his *Miranda*[10] rights, and Berube acknowledged he knew why they were questioning him. He denied knowing or shooting Barquet. He also denied fleeing Seattle and claimed his trip to New Bedford had been discussed for months.

---

[8] Ex. 33, at 6.

[9] *Id.*

[10] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶13 He was not at first forthcoming. But eventually Berube acknowledged he was at Thompson's Point of View with his brother the night of the shooting. He said he did not "remember" talking to Barquet there.[11] He also eventually admitted being at Waid's and said he saw the shooting and knew who shot Barquet. When asked the name of the shooter, however, he responded, "That's not how I roll. I'm not down like that."[12] He became agitated, told detectives they "didn't have anything on him and that he'd see [them] in court,"[13] and remarked that police "may have witnesses now, but he wanted to see who would actually follow through at the time of trial and testify against him and his brother."[14]

¶14 Berube was charged with first degree assault while armed with a firearm and first degree unlawful possession of a firearm.

¶15 At trial, Barquet testified she had no doubt Berube was the person who shot her. Joseph Burgess testified that Berube looked like the man who had run past him. The detectives testified to Berube's statements. The jurors saw the video and heard the taped conversations between Berube and his brother in the jail.

¶16 In the defense case, Berube's mother, Deborah Berube, testified that Berube had told her he had had drinks with Barquet the night of the shooting: "She had some bottles of liquor in the back of her car, and they were drinking."[15] Ms. Berube also testified that she had not seen her son for 13 years and that she and her son had been talking for several months about his visit to New Bedford.

¶17 Berube took the stand. He testified that on July 11, he and Emory were at Thompson's Point of View, where he

---

[11] RP (Apr. 20, 2009) at 49.

[12] *Id.* at 52.

[13] *Id.*

[14] *Id.* at 55.

[15] RP (Apr. 21, 2009) at 39-40.

spoke cordially with Barquet and drank vodka with her in Kyla Jackson's car.[16] He knew that Emory argued with Barquet at Thompson's, and he saw them exchanging insults later outside Waid's. When he heard the shots, he ran down the street and got a ride home. He also testified that he knew people who were present at the time of the shooting but refused to provide their names and would not name the person who drove him home. He denied fleeing to Massachusetts to avoid arrest.

¶18 The jury found Berube guilty as charged.

## DISCUSSION

### *Standard of Review*

 ¶19 Berube's appeal centers upon allegations that the prosecutor committed misconduct in closing argument. Because Berube did not object to any of the alleged improprieties, he has waived any objection unless the misconduct was so flagrant and ill intentioned as to cause enduring prejudice that could not have been cured by instruction to the jury and had a substantial likelihood of affecting the verdict.[17]

### *Injection of Racial Prejudice*

¶20 The reluctance of witnesses to come forward was a major theme at trial. In her closing argument, the prosecutor asserted that witnesses were not willing to testify against Berube "because there is a code. And that code is: Don't snitch. Don't get the police involved. Don't help the

---

[16] The court reporter's notes of the testimony of Ivory Berube and Officer James Dyment were lost and therefore were not transcribed. The court and the parties agreed on a means of reconstructing the record, and the court approved a narrative report of proceedings. *See* Clerk's Papers at 100-09. Berube noted additions and objections, some of which the court adopted. *See* Clerk's Papers at 111-16. Berube does not contend the record is insufficient for review. This summary is taken from the court's narrative report.

[17] *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

police. Don't assist in bringing someone down. We will handle it ourselves. We will execute street justice."[18] Berube contends this argument effectively injected racial prejudice into the proceedings because the defendant, the victim, and people photographed at the scene were African American. He urges us to apply the constitutional harmless error test applied in *State v. Monday*.[19]

¶21 *Monday* also involved a shooting and a coincidental video recording.[20] Witnesses were reluctant to come forward, and at trial the prosecutor asked witnesses whether there was a "code" on the streets not to "snitch," or talk to police.[21] In closing argument, he argued that " 'the code is black folk don't testify against black folk.' "[22] He also referred to police, in questioning and argument, as "po-leese."

¶22 Our Supreme Court called this conduct "highly improper."[23] The court observed that the references in argument were not isolated, given the prosecutor's repeated mockery of a witness's pronunciation during trial.[24] The court emphasized that although "[c]ommentators suggest the 'no snitching' movement is very broad[, the prosecutor] intentionally and improperly imputed this antisnitch code to black persons only. . . . [T]his functioned as an attempt to discount several witnesses' testimony on the basis of race alone."[25] The court described these appeals to racial bias as "necessarily seek[ing] to single out one racial minority for different treatment, [which] fundamentally undermines

---

[18] RP (Apr. 23, 2009) at 7.

[19] *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011).

[20] The video included the actual shooting. *Id.* at 669.

[21] *Id.* at 671.

[22] *Id.* at 674.

[23] *Id.* at 679.

[24] *Id.* at 678-79.

[25] *Id.* at 678.

the principle of equal justice and is . . . repugnant to the concept of an impartial trial."[26]

¶23 The court therefore departed from the usual rule[27] and held that where a prosecutor "flagrantly or apparently intentionally appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence," the misconduct requires reversal unless the State can show the error was harmless beyond a reasonable doubt.[28] Holding that Monday's trial was "fatally tainted" by prosecutorial misconduct, the court reversed his conviction.[29] *Monday* thus announced the application of the constitutional harmless error test where a prosecutor invokes racial bias.[30] Somewhat confusingly, the *Monday* court discussed, but did not apply, the test for review when there has been no objection at trial.[31]

¶24 This case is not like *Monday*. The prosecutor here made no mention of race and did not suggest that the antisnitch code was particular to any community. Berube contends the jury would necessarily have noticed that the known participants and most of those present at the time of

---

[26] *Id.* at 680.

[27] "Generally the prosecutor's improper comments are prejudicial 'only where there is a substantial likelihood the misconduct affected the jury's verdict.'" *Id.* at 675 (emphasis and internal quotation marks omitted) (quoting *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007)).

[28] *Id.* at 680.

[29] *Id.* at 669.

[30] The constitutional harmless error test has otherwise been applied to a claim of prosecutorial misconduct only in cases of reference to defendant's pre- or postarrest silence. *Emery*, 174 Wn.2d at 757 (citing *State v. Easter*, 130 Wn.2d 228, 922 P.2d 1285 (1996) (prearrest silence); *State v. Fricks*, 91 Wn.2d 391, 396-97, 588 P.2d 1328 (1979) (postarrest silence)).

[31] The State argued the "flagrant and ill-intentioned, enduring prejudice, substantial likelihood" test should apply. *Monday*, 171 Wn.2d at 679. The court observed that the State "notes that Monday's counsel did not object" and argued Monday could not show there was a substantial likelihood the misconduct affected the verdict. *Id.* The court discussed the test but did not resolve its applicability and simply moved on to the constitutional harmless error test. *Id.* at 679-80.

the shooting were African American. Even if that is true,[32] that fact does not transform the mention of an antisnitch code into racial commentary. As the *Monday* court observed, unwillingness to cooperate with police is widespread.[33] Describing a general unwillingness to help police is not like alleging a refusal by "black folk" to testify "against black folk." The evil lies in the State's introduction of a racial element.[34] The State did not do so here.

¶25 A prosecutor has "wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury."[35] Both the prosecution and the defense commented in closing argument about witnesses' reluctance to talk to police. The evidence included numerous references, beginning with those made by Berube himself, to the antisnitch code. Berube said he wanted to see whether any witnesses would "follow through at the time of trial and testify against him and his brother."[36] The victim, Barquet, had to be arrested as a material witness to ensure her cooperation. Her companion for part of the evening (and an eyewitness to the shooting), Alysha Johnson, did not cooperate with police. Defense counsel elicited testimony from Detective Cooper about "people from this social group" who "don't want to talk to the police."[37] Many people were present at the time of the shooting, but none came forward to tell police what they had seen and none testified.[38] The evidence was replete

---

[32] As indicated earlier, most of those present did not testify and the video is grainy and blurry.

[33] *Monday*, 171 Wn.2d at 678.

[34] *Id.*

[35] *State v. Stenson*, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997).

[36] RP (Apr. 20, 2009) at 55.

[37] *Id.* at 71.

[38] In closing argument, defense counsel asserted that "the jurors don't know the society with which this incident happened. They don't know the people. They don't know their customs. They are not familiar with people that will not talk to the

with examples of a general reluctance to cooperate with police.

¶26 The prosecutor's comments were based upon the evidence and had no racial content. There was no misconduct.

### Generic Tailoring Argument

¶27 Under both the United States and the Washington State Constitutions, a defendant has the right to "appear and defend in person," to testify on his own behalf, and to confront the witnesses against him.[39] Berube argues that when the prosecutor called attention in closing argument to the fact that Berube had the benefit of hearing other witnesses before he testified, his exercise of those rights was transformed into a burden on his credibility.

¶28 Berube had told police he did not see Barquet or Jackson the night of the shooting. His mother testified, however, that Berube had described having drinks with Barquet that night. Berube testified consistent with his mother's account. In closing argument, the prosecutor made the following comment challenging Berube's credibility:

> And what does he do then when he takes the stand about that conversation, he who has sat here throughout the entire trial and listened to everything that everyone testifies about? He has to make his version of his events conform with what he has heard his mother testify about. So he tells you that Kyla

police, refuse to talk to the police, and don't like to talk to the police. That is what's going on with this case." RP (Apr. 23, 2009) at 28. He described a difficulty of the defense as "the people that don't want to name names. That is part of the society for [witnesses to the shooting]. It is the way they work." *Id.* at 28-29.

[39] The Sixth Amendment to the United States Constitution provides in pertinent part, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The confrontation clause includes the right to be present at trial. *Illinois v. Allen*, 397 U.S. 337, 338, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970). Article I, section 22 of the Washington Constitution provides in pertinent part, "In criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel, to demand the nature and cause of the accusation against him, to have a copy thereof, to testify in his own behalf, to meet the witnesses against him face to face."

and Tanisha had a drink and that he stood there and sipped his vodka drink with them. If that had happened, Tanisha would have told you that that happened because that would only strengthen her identification of him as the shooter.[40]

¶29 At the time of Berube's trial, the controlling case law permitted "generic" tailoring arguments—that is, arguments that defendant's testimony was tailored, based only upon defendant's presence at trial. In *Portuondo v. Agard*, the United States Supreme Court held that a testifying defendant should be treated as other witnesses are treated, observing that commentary upon a defendant's opportunity to tailor his testimony is appropriate and "sometimes essential."[41] In *State v. Miller*, this court followed the rule in *Portuondo* and the Washington Supreme Court denied review.[42]

¶30 After Berube's trial however, our Supreme Court rejected the *Portuondo* rule and concluded that the Washington Constitution provides greater protections than does the Sixth Amendment. In *State v. Martin*, the court expressly adopted the standard articulated by Justice Ginsburg in her *Portuondo* dissent.[43]

¶31 In Justice Ginsburg's view, arguments "tied only to the defendant's presence in the courtroom and not to his actual testimony" amount to an "irrebuttable observation that can be made about any testifying defendant" and do not help the jury "sort those who tailor their testimony from those who do not, much less the guilty from the innocent."[44] Justice Ginsburg approved the "carefully restrained and moderate position" taken by the Second Circuit, which would allow a prosecutor "at any stage of a trial to accuse a

---

[40] RP (Apr. 23, 2009) at 24.

[41] 529 U.S. 61, 73, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000).

[42] 110 Wn. App. 283, 285, 40 P.3d 692, *review denied*, 147 Wn.2d 1011, 56 P.3d 565 (2002).

[43] 171 Wn.2d 521, 534-36, 252 P.3d 872 (2011).

[44] *Portuondo*, 529 U.S. at 77-78 (Ginsburg, J., dissenting).

defendant of tailoring specific elements of his testimony to fit with particular testimony given by other witnesses,"[45] but would disallow tailoring arguments "where there is no particular reason to believe that tailoring has occurred and where the defendant has no opportunity to rebut the accusation."[46]

¶32 Applying this rule to its facts, our Supreme Court held in *Martin* that state constitutional protections were not violated when, on cross-examination, the prosecutor suggested that the defendant had tailored his testimony.[47] The court emphasized the distinction between cross-examination and closing argument: "It is during cross-examination, not closing argument, when the jury has the opportunity to determine whether the defendant is exhibiting untrustworthiness."[48]

¶33 From this, Berube posits that a tailoring argument is always prohibited if not preceded by cross-examination. He contends that because the tailoring issue was not raised during his cross-examination, it amounted to a "generic tailoring argument unmoored from admitted evidence" such that reversal is required under *Martin*.[49] Essentially Berube argues that a prosecutor may not make a tailoring argument without first cross-examining on the subject, even where the argument derives entirely from the defendant's testimony on direct.

¶34 We disagree. First, the *Martin* court expressly declined to address generic tailoring arguments.[50] Further, the evil addressed in *Martin* is a closing argument that burdens the exercise of constitutional rights without an

---

[45] *Id.* at 78 (Ginsburg, J., dissenting).

[46] *Id.* (Ginsburg, J., dissenting).

[47] *Martin*, 171 Wn.2d at 536.

[48] *Id.*

[49] Appellant's Br. at 28.

[50] *Martin*, 171 Wn.2d at 536 n.8.

evidentiary basis and in a fashion preventing the defendant from meaningful response. When tailoring is alleged based on the defendant's testimony on direct examination, the argument is a logical attack on the defendant's credibility and does not burden the right to attend or testify. And it makes no sense to require the State to raise the issue again on cross-examination in order to make its credibility argument in closing. There was no misconduct.

### Shifting the Burden of Proof

¶35 "A criminal defendant has no burden to present evidence, and it is error for the State to suggest otherwise."[51] Of the numerous people in the area at the time of the shooting, only Joseph Burgess, Tanisha Barquet, and the defendant testified at trial. The prosecutor made the following remarks in closing argument:

> And why wouldn't [Berube] provide you with the names of any of the people that he was with who could corroborate his version of these events, the people who could help him out and say that he did what he told you he did?
>
> The code that's out there does not override common sense. And when you're accused of a crime, . . . you do not remain silent and take the hit for someone else. You talk in that situation. And when there are others who can help you out, you provide the names of those others. And you need to ask yourself: Is Ivory Berube so self-sacrificing and is he protecting others with this code or is it because there is no one who can corroborate his version of events?[52]

¶36 Berube contends these remarks impermissibly shifted the burden to him to produce missing witnesses. Berube relies upon *State v. Montgomery*.[53]

¶37 But *Montgomery* involved a missing witness instruction given by the court. There, the prosecutor made numer-

---

[51] *State v. Montgomery*, 163 Wn.2d 577, 597, 183 P.3d 267 (2008).

[52] RP (Apr. 23, 2009) at 44.

[53] 163 Wn.2d 577, 183 P.3d 267 (2008).

ous references to the absence from trial of the defendant's grandson and landlord and questioned the defendant extensively as to where they were and why they did not testify to corroborate his explanation about materials commonly obtained to manufacture methamphetamine.[54] The prosecutor then requested, and the trial court gave, a missing witness instruction, which permitted the jury to infer that the missing witnesses' testimony would have been unfavorable to Montgomery.[55] Our Supreme Court reversed, holding the instruction unjustified because the witnesses were not in the particular control of the defendant and their testimony would have been immaterial and/or cumulative.[56]

¶38 Berube's reliance upon *Montgomery* is misplaced. The State did not suggest that any witness was particularly under Berube's control and did not request a missing witness instruction, so the test for justifying the instruction is not pertinent. Rather, the argument was another challenge to Berube's credibility. The State emphasized that despite conceding he knew some of those present at the shooting and that he could identify the shooter, Berube refused to do so, and predicted that witnesses would not testify at trial. The State was entitled to comment upon these facts. To the extent the prosecutor's argument implied that Berube had a burden to produce witnesses, any error was easily curable by an instruction and was therefore waived by Berube's failure to object.

### Appeal to the Jury's Passion and Prejudice

¶39 A prosecutor may not appeal to the passions of a jury so as to encourage a verdict based on emotion

---

[54] *Id.* at 596-97.

[55] *Id.*

[56] *Id.* at 599.

rather than evidence.[57] "A trial in which irrelevant and inflammatory material is introduced, which has a natural tendency to prejudice the jury against the accused, is not a fair trial."[58] Berube contends that the prosecutor improperly appealed to the jury's passion and prejudice by the following remarks:

> How sad is it that a mother and a son would go for 13 years without seeing each other? And how happy his mother must have been when he came to see her. And how disappointed must she have been when she learned that he came because he was running from the law?[59]

¶40 Berube relies upon cases that are easily distinguished. In *State v. Belgarde*, the prosecutor described the American Indian defendant a leader in " 'a deadly group of madmen' " and " 'butchers that kill indiscriminately.' "[60] In *State v. Miles*, the prosecutor's introduction of hearsay evidence alleging a plan by the defendants to perpetrate a robbery like the one with which they were charged was not cured by a judicial instruction.[61]

¶41 Nothing of that sort occurred here. The prosecutor used no inflammatory language and introduced no hearsay or new evidence. Berube's mother testified she loved her son, and it was not an unreasonable inference that she would be saddened and disappointed by the circumstances. And again, Berube did not object. The statements, even if improper, were not flagrant and ill intentioned, were easily curable by instruction, and do not warrant notice for the first time on appeal.

---

[57] *State v. Belgarde*, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988).

[58] *State v. Miles*, 73 Wn.2d 67, 70, 436 P.2d 198 (1968).

[59] RP (Apr. 23, 2009) at 23.

[60] *Belgarde*, 110 Wn.2d at 508.

[61] 73 Wn.2d 67, 68-71, 436 P.2d 198 (1968).

*Mischaracterization of Burden of Proof*

¶42 Berube next contends the prosecutor mischaracterized the burden of proof and the reasonable doubt standard:

> This is like a puzzle that you need to put together when you go back into that room. And all the pieces of this puzzle fit together. And this is not a thousand-piece puzzle where everything is a shade of blue when you're trying to make it all fit together. This is a kid's puzzle, and the pieces in this puzzle are very big, and they all fit together.
>
> [Defense counsel] said he wanted a fair trial in this process. Mr. Ivory Berube has received a fair trial. He has the right to confront the witnesses against him. He has the right to call witnesses on his behalf. The burden is all mine.
>
> The word verdict means to speak the truth. And I ask that you search for the truth. When you go back into that jury room, you search for the truth, not a search for reasonable doubt. And I ask that you find him guilty.[62]

Berube argues the prosecutor impermissibly portrayed the reasonable doubt standard as a defense tool for hiding the truth and suggested that a jury's scrutiny of the evidence for reasonable doubt is inconsistent with a search for the truth.

¶43 We agree. A criminal trial may in some ways be a search for truth.[63] But truth is not the jury's job. And arguing that the jury should search for truth and not for reasonable doubt both misstates the jury's duty and sweeps aside the State's burden. The question for any jury is

---

[62] RP (Apr. 23, 2009) at 48.

[63] *See, e.g.*, *United States v. Mezzanatto*, 513 U.S. 196, 204-05, 115 S. Ct. 797, 130 L. Ed. 2d 697 (1995); *Jones v. Basinger*, 635 F.3d 1030, 1040 (7th Cir. 2011); *United States v. Harper*, 662 F.3d 958, 961 (7th Cir. 2011) (noting that both the United States Supreme Court and the Seventh Circuit "have repeatedly noted that criminal jury trials serve an important 'truth-seeking' function"); *Portuondo*, 529 U.S. at 73 (discussing the "central function of the trial, which is to discover the truth").

whether the burden of proof has been carried by the party who bears it. In a criminal case, the State must prove its case beyond a reasonable doubt. The jury cannot discern whether that has occurred without examining the evidence for reasonable doubt.

¶44 In *State v. Emery*, a similar argument was made:

> "The literal translation of [the Latin term] 'verdictum' into the English language is to speak the truth. Your verdict should speak the truth.
>
> ". . . .
>
> "Members of the jury, I ask you, go back there to deliberate, consider the evidence, use your life experience and common sense, and speak the truth by holding these men accountable for what they did."[64]

Our Supreme Court held the argument improper:

> The jury's job is not to determine the truth of what happened; a jury therefore does not "speak the truth" or "declare the truth." Rather, a jury's job is to determine whether the State has proved the charged offenses beyond a reasonable doubt.[65]

However, the court held the error had been waived by failure to object because defendants could not show the improper remarks were "incurable or prejudicial."[66] The court reasoned that if flagrantly improper truth statements that undermine the burden of proof can be cured by an *imperfect* instruction, as in *State v. Warren*, the remarks by the prosecutor in *Emery* were also curable.[67]

¶45 The same is true here. Berube did not object, and the impropriety was easily curable, especially in light of the court's instructions. Any error was waived.

---

[64] 174 Wn.2d 741, 751, 278 P.3d 653 (2012).

[65] *Id.* at 760 (citation and internal quotation marks omitted).

[66] *Id.* at 765.

[67] *Id.* at 763-64 (discussing *State v. Warren*, 165 Wn.2d 17, 24-25, 195 P.3d 940 (2008)).

¶46 Finally, Berube argues that the prosecutor's puzzle analogy trivialized the State's burden. In *State v. Johnson*, the prosecutor likened the "abiding belief" portion of the reasonable doubt standard to a partially completed puzzle, and that despite some missing pieces, it was possible to conclude beyond a reasonable doubt what the puzzle represented.[68] The prosecutor continued, " 'To be able to find reason to doubt, you have to fill in the blank, that's your job.' "[69]

¶47 The court reversed, holding the "fill in the blank" argument improper:

> [T]he prosecutor's arguments discussing the reasonable doubt standard in the context of making an affirmative decision based on a partially completed puzzle trivialized the State's burden, focused on the degree of certainty the jurors needed to act, and implied that the jury had a duty to convict without a reason not to do so.[70]

¶48 The puzzle analogy is an apt description of a trial, given that evidence is heard not in logical or chronological order but in order of witness knowledge. The problem arises when the analogy is used to trivialize the State's burden under the reasonable doubt standard. Here, the prosecutor did not argue the jury must supply missing puzzle pieces in order to justify reasonable doubt, as was argued in *Johnson*. Rather, she said, "[T]he pieces in this puzzle are very big, and they all fit together."[71] This does not trivialize the State's burden and was not improper.

---

[68] 158 Wn. App. 677, 682, 243 P.3d 936 (2010), *review denied*, 171 Wn.2d 1013, 249 P.3d 1029 (2011).

[69] *Id.*

[70] *Id.* at 685. A similar argument without such language has been held proper. *State v. Curtiss*, 161 Wn. App. 673, 700, 250 P.3d 496, *review denied*, 172 Wn.2d 1012, 259 P.3d 1109 (2011).

[71] RP (Apr. 23, 2009) at 48.

*Special Verdict Instruction*

¶49 The court here instructed the jury that it must be unanimous to answer whether the State proved the facts necessary to support a sentencing enhancement.[72] Berube accurately contends that under *State v. Bashaw*, such an instruction was error.[73] But our Supreme Court recently overruled *Bashaw* and expressly held that the instruction given here was correct. There was no error.[74]

¶50 Affirmed.

APPELWICK and SCHINDLER, JJ., concur.

Reconsideration denied December 12, 2012.

Review denied at 178 Wn.2d 1002 (2013).

---

[72] Instruction 18 provided in pertinent part, "If you find the defendant guilty of this crime, you will then use the special verdict form and fill in the blank with the answer 'yes' or 'no' according to the decision you reach. Because this is a criminal case, all twelve of you must agree in order to answer the special verdict form. In order to answer the special verdict form 'yes,' you must unanimously be satisfied beyond a reasonable doubt that 'yes' is the correct answer. If you unanimously have a reasonable doubt as to this question, you must answer 'no.' " Clerk's Papers at 50.

[73] 169 Wn.2d 133, 145, 234 P.3d 195 (2010), *overruled by State v. Guzman Nuñez*, 174 Wn.2d 707, 285 P.3d 21 (2012).

[74] *Guzman Nuñez*, 174 Wn.2d at 709-10.