IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32059-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL W. ROBISON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Michael Robison appeals his conviction of first degree

robbery, arguing that the court erred in permitting the State to elicit prejudicial testimony

about his drug use that it had earlier excluded; that his Fifth Amendment Right against

self-incrimination was violated when the State implied that Mr. Robison had refused a

request to provide a DNA[1] sample; and that the court's use of optional "abiding belief"

language in its instruction on the burden of proof impermissibly implied that the jury

must search for the truth. We find no error or abuse of discretion and affirm.

FACTS AND PROCEDURAL BACKGROUND

On an evening in January 2011, a lone employee working at an ice cream parlor

on Spokane's South Hill was robbed by a man who entered the store brandishing a gun

_____

[1] Deoxyribonucleic acid.

and wearing what the employee described as "a red stocking cap" with holes for his eyes and mouth "pulled down over his face" and a dark sweatshirt with the hood pulled up. Report of Proceedings (RP) at 121. After the employee complied with the robber's order to hand over all the cash in her register, the robber left the store and the employee called 911.

Responding police officers were unable to locate any suspect but did find a discarded red ski mask, an Airsoft pistol,[2] and a sweatshirt in a nearby alley. A pair of knit gloves and sweatpants were also found discarded near the store.

The recovered evidence was submitted to the Washington State Patrol Crime Laboratory, where it was analyzed for wearer DNA. DNA profiles created for an individual who was a major contributor to the DNA on the knit gloves and the individual who was a major contributor to the DNA on the red ski mask matched each other.

Since there was no suspect against whom to compare the wearer profile, the DNA profiles were attributed to "Unknown individual A." RP at 219. They were entered into CODIS, a DNA database,[3] but did not produce a match. Lacking any information to pursue, investigation into the robbery was suspended.

---

[2] At trial, witnesses described the Airsoft pistol as a BB gun that looks like a real weapon. An orange tip on the pistol used in the robbery had been painted black to make it look more like a real firearm.

[3] A forensic scientist with the Washington State Patrol explained during her testimony that "CODIS is a national and state level database that we can put DNA typing

Later that year, Breanne Snyder was charged with a number of felonies, including burglary, trafficking in stolen property, and unlawful issuance of a bad check. She spoke with her defense lawyer about providing information about a first degree robbery as a possible means of getting charges against her reduced. Her lawyer arranged for her to provide information to detectives in a "free talk."[4] RP at 327. According to Ms. Snyder, she and the defendant, Michael Robison, had been living together on the day of the January 2011 robbery, and Ms. Snyder, who was then addicted to opiates, had been suffering through withdrawals. She and Mr. Robison had arrived at a plan for Mr. Robison to rob the ice cream parlor to get money to buy opiate pills. They anticipated, correctly, that an ice cream parlor would not have many customers on a winter evening. Ms. Snyder claims to have dropped Mr. Robison off near the store, saw him commit the robbery through the store's windows, and later picked him up.

---

profiles into from case work. . . . And those are continuously searched against different databases, such as convicted offender databases and things like that." RP at 219.

[4] The detective who engaged in the free talk with Ms. Snyder explained, "A free talk can be one of up to two or three different things. But, generally it is someone whom has been charged or could potentially be charged with a crime. Through their attorney, they contact the prosecutor's office and say that they want to provide information . . . . If you are interested in that information, they want consideration back on the charges or potential charges they may face." RP at 327.

The information provided by Ms. Snyder led the State to charge Mr. Robison with first degree robbery. The State obtained a search warrant for his DNA and analysis produced a DNA profile that matched the profile of "Unknown individual A."

Before trial, the court ruled on a State motion in limine asking the court to admit evidence of Mr. Robison's alleged addiction to opiates at the time of the robbery. No record of that motion or the resulting order is in our record, other than the State's description when it raised the issue again on the first day of trial. At that time, the prosecutor explained:

> [T]he court had earlier ruled that we were not going to be talking about what particular drug Mr. Robison was using and the fact that, in at least Ms. Snyder's mind, he was addicted to that drug. The drugs we are talking about are opiate based pills and heroin.
>
> Based on the information and the interview that we had with Ms. Snyder on Friday . . . she said at the time of this incident while neither one of them were high, they were both withdrawing from their opiates and that placed them on edge. I do think that that is relevant to the motive for the crime in this case.
>
> I don't want to—I still don't think I have to talk about the defendant himself being addicted to heroin or opiates, but I do think it is relevant for her to say that, We were coming down from those on this particular day and that made us desperate and on edge to get money in order to be able to get high again.
>
> So I am asking the court to look at that ruling again and broaden it slightly for the [S]tate.

RP at 10-11.

The court stood by its original ruling, explaining that discussion of addiction and coming down from withdrawals "has a little bit more of an edge to it," and "I am not

4

persuaded that we need to go there. I have already indicated that she could testify that they needed the money for drugs. That I think is beyond sufficient, and I don't think we need to go beyond that." RP at 18.

Among witnesses called by the State at the time of trial were Ms. Snyder, the clerk who was robbed, police detectives, and a DNA analyst.

The defense theory was that while Ms. Snyder and one of her other junkie friends might have committed the robbery, Mr. Robison was not with Ms. Snyder on the day of the robbery. His lawyer argued that in providing information to the State to alleviate some of her own criminal problems, Ms. Snyder had falsely named Mr. Robison, from whom she was estranged, rather than the actual robber. Mr. Robison testified on his own behalf, telling the jury that he never lived with Ms. Snyder but stayed with her on occasion and that he had left some clothing at her home. He testified that he and Ms. Snyder spent time outdoors during the winter and that he had worn her red ski mask in the past.

During cross-examination, Mr. Robison was asked about Ms. Snyder's drug use and testified that he was trying to help her to "change her ways" by "[t]ry[ing] to get her to go to meetings and not hang out with people she was hanging out with." RP at 381. When the prosecutor then asked, "Like you?", Mr. Robison testified "I am not a drug addict." *Id.* The prosecutor's questioning about drugs continued and defense counsel

5

eventually objected, citing "a pre-trial ruling by the court." RP at 383. The court responded, "The door is opened. Overruled." *Id.*

At the conclusion of the evidence, the jury returned a verdict of guilty. Mr. Robison appeals.

## ANALYSIS

Mr. Robison assigns error to a trial court ruling that testimony by Mr. Robison had "opened the door" to examination about his drug use, that the State's questioning of a police officer was an unconstitutional comment on his silence, and that the burden of proof instruction misstated the law. We address the assignments of error in turn.

### *Trial court ruling that Mr. Robison's testimony "opened the door"*

Mr. Robison first argues that he was denied a fair trial when the court admitted evidence contrary to its own pretrial ruling on the rationale that Mr. Robison's testimony had "opened the door."

Our record on appeal does not include the original motion or ruling on the State's request that it be permitted to offer evidence that Mr. Robison was addicted to opiates at the time of the robbery. But the argument and ruling when the State renewed the motion on the first day of trial suffices to establish that the trial court had ruled that it would admit evidence that Mr. Robison was alleged by Ms. Snyder to have committed the

6

robbery to obtain money for drugs.[5] What the court excluded was evidence that Mr. Robison was addicted or was going through withdrawals at the time of the crime. The court also excluded any reference of opiates being the type of drug Mr. Robison wanted to purchase. Consistent with the ruling, the State only asked about Ms. Snyder's drug use up until the point at which Mr. Robison volunteered that he was not a drug addict.[6]

Moreover, when the State relied on that opening to inquire further, including into "what . . . [Mr. Robison] use[d]," defense counsel did not initially object based on the pretrial ruling. Mr. Robison testified without objection that he used opiate pills, specifically "Roxy and Oxy" prior to any objection by his lawyer. RP at 381-82. After defense counsel objected, the prosecutor posed only a couple more, inconsequential questions about drug use:

> Q. (BY MR. MARTIN) You would use these items with Ms. Snyder?

---

[5] The State asks us to refuse to review this claimed error because Mr. Robison has not provided an adequate record or record citations, in violation of RAP 10.3(a)(5) and (6). We find Mr. Robison's citations sufficient for review.

[6] The following questions preceded Mr. Robison's statement:

> Q. So why were you dating somebody who was addicted to drugs?
> A. I was hoping she would change her ways.
> Q. What steps were you taking to help her change her ways?
> A. Try to get her to go to meetings and not hang out with people she was hanging out with.
> Q. Like you?
> A. I am not a drug addict.

RP at 381.

A. On occasions.
Q. How did you think that using these items with Ms. Snyder was going to assist her in getting her over her drug addiction?
A. I don't know.

RP at 383.

"Otherwise inadmissible evidence is admissible on cross examination if the witness 'opens the door' . . . and the evidence is relevant to some issue at trial." *State v. Stockton*, 91 Wn. App. 35, 40, 955 P.2d 805 (1998) (footnote omitted). Once Mr. Robison offered what might be considered evidence of his good character, the State apparently concluded that he had opened the door for the State to rebut this evidence. ER 404(a)(1). "[I]t is a sound general rule that, when a party opens up a subject of inquiry on direct or cross-examination, he contemplates that the rules will permit cross-examination or redirect examination, as the case may be, within the scope of the examination in which the subject matter was first introduced." *State v. Gefeller*, 76 Wn.2d 449, 455, 458 P.2d 17 (1969).

Even if the State's initial assessment was wrong, the testimony given thereafter—before any defense objection—opened the door widely. A timely defense objection was required. Mr. Robison prevailed on the pretrial in limine argument when the trial court ruled that the State could offer only evidence "that they needed the money for drugs . . . I don't think we need to go beyond that." RP at 18. "In a situation where a party prevails on a motion in limine and thereafter suspects a violation of that ruling, *the party has a*

8

*duty to bring the violation to the attention of the court and allow the court to decide what remedy, if any, to direct.* A standing objection to evidence in violation of a motion in limine, preserving the issue for appeal, is allowed *only* to the party losing the motion." *A.C. v. Bellingham Sch. Dist.*, 125 Wn. App. 511, 525, 105 P.3d 400 (2004) (footnotes omitted).

In light of all of the testimony by Mr. Robison about his use of opiates before any objection by the defense, the trial court did not abuse its discretion in concluding that the door had been opened to the State's examination.

### Fifth Amendment right to remain silent

Mr. Robison next argues that the State violated his right to remain silent when State questioning implied that he would have refused to provide a buccal swab for DNA analysis had the court not issued a search warrant.

"The right against self-incrimination is protected by the Fifth Amendment, which provides that no person 'shall be compelled in any criminal case to be a witness against himself.'" *City of Seattle v. Stalsbroten*, 138 Wn.2d 227, 232, 978 P.2d 1059 (1999) (footnote omitted) (quoting U.S. CONST. amend. V). "Because taking a DNA sample constitutes a search . . . individuals have a constitutional right to refuse consent to warrantless sampling of their DNA." *State v. Gauthier*, 174 Wn. App. 257, 263, 298 P.3d 126 (2013). In *Gauthier*, the court held that it was error to admit evidence of a defendant's refusal to consent to a DNA test, concluding that our Supreme Court

indicated in *State v. Jones*, 168 Wn.2d 713, 725, 230 P.3d 576 (2010) that "using refusal

to consent to a search as evidence of guilt is unconstitutional." *Gauthier*, 174 Wn. App.

at 266.

The examination about which Mr. Robison complains does not support his

characterization, however. He relies on the following examination by the State of a

detective assigned to investigate the robbery:

> Q. What happened in terms of furthering your investigation after the charges were filed by the county prosecutor's office?
> A. At the time of the filing, and I spoke with Prosecutor Steinmetz, I explained to him that I would want him to obtain a sample of DNA from Mr. Robison. At that point, I wrote what is called a search warrant, requesting the court to grant me permission to obtain and—to contact Mr. Robison to obtain a DNA sample, and that was done.
> Q. Without the search warrant, could you have obtained DNA from Mr. Robison? Let me state that question a better way. Without the search warrant, could you have forced Mr. Robison to give you DNA?
> A. I could not.
> Q. Was the search warrant granted?
> A. Yes, it was.
> . . . .
> Q. Were you able to get a lawful search warrant in this case to collect DNA from Mr. Robison?
> [DEFENSE COUNSEL]: Objection. Asked and answered.
> THE COURT: I will permit that.
> A. I did.
> Q. What does it mean to execute a search warrant?
> A. It means that I, as a detective, and the judicial person authorized to sign the search warrant authorized me so much time to collect the evidence. In this case, I was able to contact Mr. Robison's attorney. I made arrangements and advised them that I had a search warrant for a buccal swab, and we made arrangements to meet and obtain the buccal swab.
> Q. Was Mr. Robison cooperative in that endeavor?

No. 32059-6-III
*State v. Robison*

A.  Absolutely, he was.

RP at 349-51.

The evidence does not suggest that Mr. Robison would have refused to provide a

DNA sample; to the contrary, the detective characterized Mr. Robison as cooperative.

The State did not impermissibly imply that Mr. Robison refused to consent to a DNA

test.

*Burden of proof instruction*

Finally, Mr. Robison complains that over the objections of his lawyer and the

State, the court provided the jury with the pattern burden of proof instruction for criminal

trials, including its bracketed, optional final sentence.  The entire instruction read:

> The defendant has entered a plea of not guilty.  That plea puts in issue
> every element of the crime charged.  The State, is the plaintiff and has the burden
> of proving each element of the crime beyond a reasonable doubt.  The defendant
> has no burden of proving that a reasonable doubt exists.
> A defendant is presumed innocent.  This presumption continues
> throughout the entire trial unless during your deliberations you find it has
> been overcome by the evidence beyond a reasonable doubt.
> A reasonable doubt is one for which a reason exists and may arise
> from the evidence or lack of evidence.  It is such a doubt as would exist in
> the mind of a reasonable person after fully, fairly, and carefully considering
> all of the evidence or lack of evidence.  If, from such consideration, you
> have an abiding belief in the truth of the charge, you are satisfied beyond a
> reasonable doubt.

Clerk's Papers (CP) at 39; *see also* 11 WASHINGTON PRACTICE: WASHINGTON

PATTERN JURY INSTRUCTIONS: CRIMINAL § 4.01, at 85 (3d ed. 2008) (WPIC).

Relying on cases holding that the State may not argue that a jury's job is to search

11

for the truth, Mr. Robison argues that the final sentence of the instruction

"inexorably connects the concepts of truth and being satisfied beyond a reasonable

doubt." Br. of Appellant at 22.

We review "a challenged jury instruction de novo, evaluating it in the context of

the instructions as a whole." *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995).

Language speaking of an "abiding belief" or an "abiding conviction" in "the truth

of the charge" has withstood challenge in Washington for more than a half century. In

*State v. Mabry*, 51 Wn. App. 24, 25, 751 P.2d 882 (1988), this court upheld the almost

identical concluding statement in WPIC 4.01, as revised in 1982, the only difference

being the former instruction's use of the expression "*after* such consideration" rather than

"*from* such consideration." The court observed that the instruction "was approved

essentially in *State v. Tanzymore*, 54 Wn.2d 290, 340 P.2d 178 (1959),[7] and was also

approved as modified in *State v. Walker*, 19 Wn. App. 881, 578 P.2d 83 [1978]." *Id.* It

pointed out that "[w]hen reviewing 'reasonable doubt' instructions, courts have refused to

isolate a particular phrase and have instead construed them as a whole." *Id.*

---

[7] The instruction given in *Tanzymore* included the statement, "If, after a careful consideration and comparison of all the evidence, you can say you have an abiding conviction of the truth of the charge, you are satisfied beyond a reasonable doubt." *Tanzymore*, 54 Wn.2d at 291 n.2. In rejecting the defendant's argument that his own proposed instruction should have been given, the court said that the standard instruction given by the court, "has been accepted as a correct statement of the law for so many years, we find the assignment without merit." *Id.* at 291.

In *Pirtle*, our Supreme Court addressed a challenge to a trial court's modification of the concluding sentence to sharpen the focus on a juror's doubt by stating, "If, after such consideration[,] you *do not* have an abiding belief in the *truth* of the charge, [then] you *are not* satisfied beyond a reasonable doubt." 127 Wn.2d at 656 (emphasis added) (first alteration in original). The revised instruction was still upheld:

> Without the last sentence, the jury instruction here follows WPIC 4.01, which previously has passed constitutional muster. The addition of the last sentence does not diminish the definition of reasonable doubt given in the first two sentences, but neither does it add anything of substance to WPIC 4.01. WPIC 4.01 adequately defines reasonable doubt. Addition of the last sentence was unnecessary but was not an error.

*Pirtle*, 127 Wash. 2d at 658.

Mr. Robison contends that more recent decisions in *State v. Emery*, 174 Wn.2d 741, 278 P.2d 653 (2012) and *State v. Berube*, 171 Wn. App. 103, 286 P.3d 402 (2012) require us to reconsider this longstanding precedent. In *Emery*, our Supreme Court held that it was prosecutorial misconduct for the State to suggest in argument that the jury's job is to solve the case, because "[t]he jury's job is not to determine the truth of what happened; a jury therefore does not speak the truth or declare the truth." *Emery*, 174 Wn.2d at 760 (internal quotation marks omitted) (quoting *State v. Anderson*, 153 Wn. App. 417, 429, 220 P.3d 1273 (2009)). Similar improper argument was made in *Berube*, in which this court stated that "[a]rguing that the jury should search for truth and not for reasonable doubt misstates the jury's duty and sweeps aside the State's burden. The

13

question for any jury is whether the burden of proof has been carried by the party who bears it." *Berube*, 171 Wn. App. at 120.

The last sentence of WPIC 4.01 is not tantamount to telling the jury that it must "solve the case" or "find the truth." *Pirtle* remains controlling authority that without the last sentence, the pattern instruction adequately defines reasonable doubt and that inclusion of the optional sentence "does not diminish the definition." *Pirtle*, 127 Wn.2d at 658.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Fearing, J.

Lawrence-Berrey, J.

14