# THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58237-6-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| PAUL ARTHUR CONROY, | |
| Appellant. | |

CHE, J. — Paul Arthur Conroy appeals his convictions for attempted theft of a motor vehicle, attempting to elude a pursuing police vehicle, and hit and run of an unattended vehicle.

During trial, Conroy testified that he had studied the police report and investigative file for two to three months in preparation for trial. In rebuttal closing argument, the State argued Conroy was not credible for several reasons, including that he had thoroughly studied the police report and investigative file in the case for a few months leading up to trial.

Conroy argues his counsel was ineffective for failing to object to the State's generic tailoring claim. He also argues the crime victim penalty assessment (VPA) should be stricken. The State does not oppose striking the VPA.

We hold that Conroy's ineffective assistance of counsel claim fails because Conroy does not show prejudice, and the VPA should be stricken.

Accordingly, we affirm Conroy's but remand to the trial court to strike the VPA.

# FACTS

## BACKGROUND

On an evening in February 2023, a neighbor called Lerud to inform him that someone was on his parents' 10-acre property with a large truck and trailer attempting to steal things.

No one lived on the property, which had no lighting, was situated on a hill, and had a barn and a couple of outbuildings. Lerud's mother stored items on the property, including her 1994 truck.

Lerud drove to the property and parked his vehicle at the bottom of the 350-foot gravel driveway to block the exit. The driveway gradually inclined to an upper landing where Lerud could see a white truck, with its headlights on, facing towards him. Lerud, carrying a flashlight and small club, approached the truck, and called 911.[1]

According to Lerud, as he approached the white truck, an older, taller, "scruffy," and angry looking man with some facial hair and "grayish" colored hair came from the driver's side of the truck, walked down the driveway with a flashlight in hand, and began yelling that Lerud should not be on the property. 3 Rep. of Proc. (RP) (June 1, 2023) at 275. Lerud yelled back, asking the older man what he was doing on his property. Lerud then saw a second, younger man exit the passenger side of the truck and consult the older man. The older man insisted that he owned the property and that Lerud should not be there, and Lerud told him to leave. The older man walked towards Lerud's parked vehicle, walked back to the truck, and then both the older and the younger man entered the truck with the older man in the driver's seat.

---

[1] Lerud remained on the call with the 911 operator as events unfolded, and the call was admitted into evidence.

Lerud stood in front of the white truck to prevent it from leaving and told the men he would not move until the police arrived. Both men then exited the truck, went to the back of the truck, and unloaded Lerud's mother's 1994 truck from a car dolly attached to the white truck.[2] The two men then reentered the white truck, with the older man in the driver's seat, who revved the engine before bumping into Lerud a couple times with the truck. Lerud beat the hood of the truck, lost his footing, fell, and then laid on the ground. The older man drove over Lerud without the truck touching Lerud.

Lerud chased after the truck to the bottom of the driveway, where it attempted to go around Lerud's vehicle before backing up, hitting Lerud's vehicle, and exiting the property.

Deputy Joshua Knapp-Andersen responded to the scene in uniform and was taking a recorded statement from Lerud in the property driveway when the white truck drove slowly by the property. Deputy Knapp-Anderson pointed his flashlight at the truck, and the driver held his hand over his face as he continued driving. Lerud identified both the suspect white truck and driver.

Deputy Knapp-Andersen followed the truck in his marked police vehicle and initiated a traffic stop by activating his lights and siren. The truck did not stop and, at points, sped up, straddled the center line of the road, crossed into the oncoming lane, and traveled in the oncoming lane. Deputy Knapp-Anderson followed the truck for approximately the next 13 miles. Officers deployed spike strips, and the truck eventually came to a stop against a fence.

---

[2] The 1994 truck's ignition had been pulled out, and the truck had been started with a screwdriver.

Deputies parked their police vehicles behind the truck.  Deputy Knapp-Anderson saw the driver's door open, and Deputy Wayde Sandoval saw someone jump over the fence, fall on the ground, get up, and run away.  Deputies gave chase, eventually locating Conroy in a muddy pasture.  No other suspects were found.  Photographs taken showed damage and paint transfer on both vehicles.

The State charged Conroy with attempted theft of a motor vehicle, attempting to elude a pursuing police vehicle, and hit and run of an unattended vehicle.[3]

According to Conroy, on the evening of his arrest, he used his white truck to help his son tow a 1994 truck for which his son had a bill of sale.  After driving his son to pick up a car dolly, Conroy felt unwell, pulled over to the side of the road, and let his son drive to their destination.

Defense counsel asked Conroy about the dimensions of his white truck and attached car dolly.  Conroy described the structure of the dolly, approximating the sizes of its various components, and estimated a ground clearance of four-and-a-half to five inches from the bottom of the dolly.

On cross-examination, the State asked Conroy about his detailed description of the dolly, and he stated that he had reviewed the discovery photos.

| [STATE] | And you provided a detailed description of the dolly, correct, when [defense counsel] was asking questions? |
|---|---|
| [CONROY] | I gave fairly good detail of it because it wasn't my dolly, but I did know how high it was off the ground because I got pictures of it and I saw it. I've been looking at the pictures for -- |
| [STATE] | What pictures do you have, sir? |
| [CONROY] | From the discovery. |
| [STATE] | So are you saying you've had a copy of the police report and the investigation file in this case? |

---

[3] The State also charged Conroy with second degree assault, but the jury acquitted Conroy of this charge.

[CONROY]   Yeah. For -- for months.

[STATE]   And you've -- is it fair to say you've been studying that material?

[CONROY]   Trying to understand it thoroughly.

[STATE]   So is that a "yes"?

[CONROY]   Yes.

[STATE]   How many months have you had that material for?

[CONROY]   Probably three months, two or three, two and a half, three months. I wasn't paying attention to the date I got it, but I know I've had it for at least two and a half months, I'd say.

[STATE]   Is it something you review on a daily basis?

[CONROY]   No.

[STATE]   No. How often do you review it?

[CONROY]   I don't know. I probably looked at it a dozen times. I can't say the intervals. Knowing I had to come to court, I've been going over it pretty thoroughly. So go over it.

5 RP (June 6, 2023) at 563-64.

Conroy gave the following account of what he claimed also happened. He denied loading a vehicle on the dolly, explaining that before he and his son had even attempted to do so, Lerud arrived and demanded that they leave the property. Conroy got into the passenger seat of his truck and told his son to leave the property. Conroy never saw anyone in front of the truck. As his son drove down the driveway, Conroy saw Lerud come up to the driver's side window and break it, yelling with a club in his hand. Conroy's son continued down the driveway, drove around Lerud's vehicle, and turned the wrong direction upon exiting the property.

Conroy's son eventually looped back around towards Lerud's parents' property. From the passenger seat, Conroy noticed that someone was shining a flashlight at his truck. At some point, Conroy saw a police vehicle behind them, and though he repeatedly told his son to pull over, his son refused.

When the truck stopped, Conroy's son exited from the driver's side door, and Conroy followed him out the same door. When they went over a fence, Conroy lost sight of his son, and the police eventually arrested Conroy.

## REBUTTAL CLOSING ARGUMENT

In rebuttal, the State argued Conroy was not credible for multiple reasons, including:

> Additionally, as you're assessing the credibility of the statements Mr. Conroy made, consider the fact that he's had the entire investigative file in this case for two and half to three months. He told you that he's reviewed it on a number of occasions. I think he said at least 12. And he described his review of the materials as thorough because he needed to be prepared for this. He has had the benefit of sitting through the testimony of everyone prior to his testimony.
>
> Ultimately, it is your decision as jurors to assess the credibility of the witnesses, but I submit to you that the testimony provided by Mr. Conroy is not credible.

6 RP (June 7, 2023) at 741-42. Defense counsel did not object to this argument.

The jury convicted Conroy of attempted theft of a motor vehicle, attempting to elude a pursuing police vehicle, and hit and run of an unattended vehicle.

The trial court found Conroy indigent and imposed a $500 VPA.

Conroy appeals.

## ANALYSIS

### I. INEFFECTIVE ASSISTANCE OF COUNSEL

Conroy argues that his counsel provided ineffective assistance by failing to object to the State's credibility argument in rebuttal. Conroy asserts that, in rebuttal, the State suggested he tailored his testimony, which deprived him of his constitutional rights to appear and testify. Specifically, Conroy contends that the State made an improper, "generic tailoring claim." Br. of

Appellant at 16. Even assuming without deciding that the State made a generic tailoring claim, Conroy fails to show prejudice.

A.       *Legal Principles*

A criminal defendant has a right to effective assistance of counsel at every critical stage of the proceeding. U.S. CONST. amend. VI; WASH. CONST. art. I, §22. The Sixth Amendment and article I, section 22 of our state constitution protect a criminal defendant's "right to appear and defend in person, to testify on [their] own behalf, and to confront witnesses against [them]." *State v. Berube*, 171 Wn. App. 103, 114, 286 P.3d 402 (2012) (internal quotation marks omitted).

To prevail on a claim of ineffective assistance of counsel, a defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Performance is deficient if it falls below an objective standard of reasonableness. *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024). We strongly presume that counsel's performance was effective. *Id.* at 130. To rebut this presumption, a defendant bears the burden of showing that there was no possible legitimate trial tactic that would explain counsel's performance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

To demonstrate prejudice, a defendant must show a reasonable probability that, absent the deficient performance, the outcome of the trial would have differed. *Bertrand*, 3 Wn.3d at 129. It is not enough to merely show that errors had some conceivable effect on the outcome of the proceeding. *Strickland*, 466 U.S. at 693. If a claim of ineffective assistance of counsel fails to support a finding of either deficiency or prejudice, it fails, and we need not address both

7

components of the inquiry or approach the inquiry in a particular order. *Strickland*, 466 U.S. at 697.

If a defendant centers their claim of ineffective assistance of counsel on their attorney's failure to object, then they must show that the objection would likely have succeeded. *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019).

A "tailoring" claim alleges that the defendant "conformed their testimony to the evidence they observed while attending trial." *State v. Carte*, 27 Wn. App. 2d 861, 871, 534 P.3d 378 (2023), *review denied*, 2 Wn.3d 1017 (2024). Tailoring arguments are either "specific" or "generic." *Carte*, 27 Wn. App. 2d at 871. They are specific if derived from the defendant's actual testimony and generic if based solely on the defendant's presence at the proceeding. *Berube*, 171 Wn. App. at 115-17. In other words, a generic tailoring claim is an "argument[] that defendant's testimony was tailored, based only upon defendant's presence at trial." *Id.* at 115.

Tailoring arguments do not violate a defendant's Sixth Amendment right to be present at trial. *See Portuondo v. Agard*, 529 U.S. 61, 73, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000). But under article I, section 22, while specific tailoring arguments do not violate our state constitution, generic ones do. *State v. Martin*, 171 Wn.2d 521, 533, 535-36, 252 P.3d 872 (2011); *see also State v. Wallin*, 166 Wn. App. 364, 376, 269 P.3d 1072 (2012). Specifically, "a generic tailoring argument raised only in the prosecution's closing argument and untethered to the defendant's direct testimony or cross-examination" violates our state constitution. *Carte*, 27 Wn. App. 2d at 873.

B.      *Conroy's Ineffective Assistance of Counsel Claim Fails Because Even Assuming the State Made a Generic Tailoring Claim, Conroy Fails to Show Prejudice*

Assuming without deciding that the State's argument amounted to a generic tailoring claim, overwhelming evidence existed that Conroy committed the crimes of attempted theft of a motor vehicle, attempting to elude a pursuing police vehicle, and hit and run of an unattended vehicle, such that an objection to the State's argument would not have changed the outcome of the trial.

Among other things, Lerud testified that Conroy unloaded Lerud's mother's 1994 truck from the dolly attached to Conroy's white truck. The 1994 truck's ignition had been pulled out, and the truck had been started with a screwdriver. Conroy admitted that he and his son were at the property with his white truck, and Lerud identified the driver of the white truck as the older of the two men.

Video evidence and police testimony showed that uniformed police, with activated lights and siren, followed Conroy's truck and that the truck did not stop, ensuing in an approximately 13-mile chase. At times, the truck straddled the center line of the road, crossed into the oncoming lane, and traveled in the oncoming lane. Officers deployed spike strips, and the truck eventually came to a stop against a fence, after which officers chased Conroy on foot before locating him in a muddy pasture.

Lastly, Lerud testified that he chased after Conroy's truck to the bottom of the driveway, where it attempted to go around Lerud's vehicle before backing up, hitting Lerud's vehicle, and exiting the property. Photographic evidence showed damage and paint transfer on both vehicles.

Thus, overwhelming evidence existed that Conroy committed the three crimes such that the State's argument did not prejudice Conroy.

Conroy's ineffective assistance of counsel claim fails because Conroy fails to demonstrate prejudice, and we need not address deficiency of performance. *Strickland*, 466 U.S. at 697.

## II. LEGAL FINANCIAL OBLIGATIONS

Conroy argues that the VPA should be stricken. The State does not oppose striking the VPA. We agree with Conroy.

Amended RCW 7.68.035(4) requires that no VPA be imposed if the trial court finds at the time of sentencing that the defendant is indigent as defined in RCW 10.01.160(3). Amended RCW 7.68.035(4) applies to Conroy because this case is on direct appeal. *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023). At sentencing, the trial court found that Conroy was indigent because he receives an annual income, after taxes, of 125 percent or less of the current federal poverty level. RCW 10.101.010(3)(a)-(c). Because the trial court made the specific indigency finding that is necessary under RCW 10.01.160(3) and this case is on direct appeal, we remand to the trial court to strike the VPA.

## CONCLUSION

We hold that Conroy's ineffective assistance of counsel claim fails because Conroy does not show prejudice, and the VPA should be stricken. Accordingly, we affirm Conroy's sentence but remand to the trial court to strike the VPA.

10

No. 58237-6-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Che, J_____
Che, J.

We concur:

_Glasgow, J_____
Glasgow, J.

_Cruser, C.J._____
Cruser, C.J.

11