IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

              Respondent,

    v.

NAOMI MARIE ELASTER,

              Appellant.

No. 84970-1-I

DIVISION ONE

UNPUBLISHED OPINION

HAZELRIGG, A.C.J. — Naomi Marie Elaster appeals from her convictions for three counts of rape of a child in the first degree and one count of child molestation in the first degree, all found to be crimes of domestic violence, after a joint jury trial with co-defendant, Billy Clyde Miller. She seeks reversal on the grounds that her constitutional right to an impartial jury was violated, the trial court denied her motion to admit certain evidence essential to her defense, and she received ineffective assistance of counsel. Elaster also challenges imposition of certain community custody conditions. We disagree and affirm. However, remand is required for the trial court to strike legal financial obligations from Elaster's judgment and sentence based on her indigency.

## FACTS

Naomi Elaster is the mother of four children: Anthony,[1] A.J.O., A.M.O., and A.A.O. In 2009, she turned over physical custody of the children to her brother,

---

[1] Anthony was an adult by the time of trial. However, this opinion uses initials to refer to the minor victim and witnesses.

Reginald Elaster, and then legal custody in 2010.[2]  Reginald and his partner, Sharon Spears, cared for the children in their home for about two years, after which he allowed them to live with Elaster and her partner at the time, Frank Anderson.[3]

In June 2019, Elaster and co-defendant Billy Miller were accused of sexual assault by her daughter, A.M.O.  In August of that year, Elaster and Miller were charged as co-defendants based on those allegations.  The State presented two counts of rape of a child in the first degree (ROC1) with special allegations of domestic violence (DV) against Elaster and two counts of ROC1 against Miller, one of which carried the DV allegation.  Nearly two years later, the State filed a first amended information that accused both Elaster and Miller of four counts of ROC1, removed the DV allegation against Miller and included it to each of the counts as to Elaster.  In August 2022, shortly before trial, the State filed a second amended information that charged Elaster with child molestation in the first degree (Count 1) and three counts of ROC1 (Counts 2-4), all of which carried the DV special allegation.  The State charged Miller with four counts of ROC1.

Elaster and Miller were tried jointly and engaged in extensive pretrial litigation on the admissibility of certain evidence.  The jury convicted them both as charged.  It also found by special verdict that Counts 1-4 were crimes of domestic violence.  The court imposed indeterminate sentences of 198 months to life in prison on Count 1 and 300 months to life in prison each on Counts 2 through 4, to be served concurrently, followed by community custody.

---

[2] Because Reginald and the defendant share the same last name, we use his first name for clarity.  No disrespect is intended.
[3] Reginald and Spears testified to slightly differing timeframes that overlapped at approximately two years.

Elaster timely appealed.[4]

ANALYSIS

I.     Claim of Juror Bias

On October 6, 2022, the court swore in the jurors and instructed them on their duties, emphasizing the importance of relying solely on the evidence presented during the trial. Before the jury was called into the courtroom on November 2, juror 11 approached the bailiff with a concern regarding what the bailiff later characterized as the truthfulness of a witness' statements under oath.

> BAILIFF: When I was leading them back, she asked if she could talk to me aside from the rest of the jurors, so she waited until everyone went into the jury room. Whenever that happens, I always just warn them and say "You have to be very careful about what you tell me. If it's something related to the trial, I can't really go into anything about that. But we also have to kind of out [sic] if there's an issue." She indicated it had to do with a witness and mentioned something about being truthful under oath. And at that point, I said, "I really can't talk to you about that any further, but I will let the court know that there's a concern and an issue." And then she asked if she would have to come out individually and I said "I don't know, but I will let the court know that there's a concern."

With the parties present, the judge had juror 11 brought to the courtroom and explained that the court needed to know if anything external to the trial had occurred regarding that witness. The juror replied that it involved Elaster's son, A.J.O.:

> JUROR 11: The witness [A.J.O.] in the parking garage, I had noticed he had driven himself yesterday, driven off in a car because I was kind of parked in view where I saw him pull up. And when we came to the courtroom, when he swore in and there was a question asked on his driver's license or something, he said he wasn't driving.

---

[4] Elaster's co-defendant Miller also appealed, No. 86870-4-I, and the two appeals were administratively linked at this court.

I'm not sure if this is an important piece of information. I just thought it, I thought that I should bring that to your attention.

COURT: Okay. So just so I'm clear—did you even know who he was when he drove up?

JUROR 11: No, I did not.

COURT: But when he took the stand, you recognized him as someone you saw driving a car?

JUROR 11: In the garage, yes, before we came back in.

COURT: Does anyone want a sidebar on this?

Following the sidebar, juror 11 was excused from the courtroom so that the parties could present argument on the matter. Counsel for each defendant separately called for juror 11 to be excused because they claimed A.J.O.'s testimony and credibility were central to the defense for each case. The court was hesitant to characterize juror 11's behavior as misconduct and proposed instead to instruct juror 11 to disregard what she had seen in the parking garage. The State agreed with the court that an instruction to disregard would be adequate. The court emphasized its conclusion that juror 11's actions did not amount to misconduct, such that a mistrial was warranted, and given the dwindling number of jurors, the court was concerned that excusing juror 11 would be "a de facto grant of mistrial." The court, however, agreed that if juror 11 indicated she would not be able to follow its instructions to disregard the extraneous information, another solution would be required. Juror 11 was called back into the courtroom and questioned by the judge.

COURT: Thank you for coming back in. Have a seat. So I want to again thank you. You did exactly, you followed my instructions, and you did exactly the right thing bringing this to our attention.

- 4 -

I'm going to instruct you now that you have to disregard anything you saw outside the courtroom with respect to this witness and what you reported to me. You're not to consider that in evaluating the evidence in this case, evaluating any particular testimony, and you're not to discuss it with the jurors. So that's my— I'm ordering you to do that, but now I need to ask you, can you follow that instruction?

JUROR 11: Yes, Your Honor.

COURT: Okay. And so you understand this has to be not considered by you at all in making your decision in this case?

JUROR 11: Yes, Your Honor.

COURT: Alright. Thank you. I'm going to send you back.

JUROR 11: Okay.

COURT: And by the way, let me—hold on. Let me bring the juror back. I apologize. I know my bailiff already told you this and you've been very good. Obviously, you're not to discuss this with anyone.

JUROR 11: Yes, Your Honor.

COURT: Thank you.

After this instruction by the court, juror 11 was sent back with the others and the trial proceeded.

Elaster asserts that the events around juror 11's communication with the bailiff to alert the court that A.J.O. was not truthful under oath demonstrated bias and the court erred when it denied the defense motions to dismiss her. The defense contends that juror 11 witnessed events involving A.J.O. after he testified that contradicted his testimony and she was therefore aware of facts outside of trial that impacted her ability to fairly decide the case. The defense further avers that curative instructions were insufficient to cure the prejudice and we must apply

structural error analysis as set out in *State v. Winborne*, 4 Wn. App. 2d 147, 420 P.3d 707 (2018). The defense reliance on *Winborne* is misplaced. The State argues that the trial court acted within its discretion because it assessed juror 11 and found that she was able to deliberate impartially. The State further contends that this error is reviewed under the harmless error standard. Based on the record and controlling law, we agree with the State as to the standard of review.

In *Winborne*, where the juror witnessed the alleged criminal behavior, Division Three of this court applied structural error analysis, not harmless error. *Id.* at 170. Structural error analysis applies when the error "impact[ed] the very trial process itself" and "prevent[ed] a criminal trial from reliably serving its function as a vehicle for determination of guilt or innocence, and no criminal punishment might be regarded as fundamentally fair." *Id*. at 171. The panel in *Winborne* also noted that Winborne would not be able to cross-examine the juror who saw the alleged criminal act if they remained on the jury, and then relied on *State v. Stentz*[5] to conclude that because Winborne was deprived of his right to confront a witness to the crimes, structural error review was warranted. *Winborne,* 4 Wn. App. 2d at 170.

We consider the trial court's decision to retain a juror under the abuse of discretion standard. To determine whether an impaneled juror has demonstrated actual bias warranting dismissal, the trial judge "'will act as both an observer and decision maker.'" *State v. Sassen Van Elsloo*, 191 Wn.2d 798, 806-07, 425 P.3d 807 (2018) (quoting *State v. Jorden*, 103 Wn. App. 221, 229, 11 P.3d 866 (2000)).

---

[5] *State v. Stentz*, 30 Wash. 134, 140-41, 70 P. 241 (1902), *abrogated on other grounds by State v. Fire*, 145 Wn.2d 152, 34 P.3d 1218 (2001).

In doing so, the trial judge must evaluate the credibility of the challenged juror. *Id*. "'A [trial] judge with some experience in observing witnesses under oath becomes more or less experienced in character analysis, in drawing conclusions from the conduct of witnesses.'" *Id*. (alteration in original) (quoting *State v. Noltie*, 116 Wn.2d 831, 839, 809 P.2d 190 (1991)). Therefore, substantial deference is granted to the trial court's determination of whether a juror is biased to an extent that justifies dismissal. *Jorden*, 103 Wn. App. at 229.

A defendant has a right to a fair and impartial jury under both the federal and state constitutions. *See State v. Guevara Diaz*, 11 Wn. App. 2d 843, 851, 456 P.3d 869, 874 (2020). "This right exists throughout the entire trial process and is safeguarded in part by statutes and rules that require the trial judge to dismiss biased jurors." *Sassen Van Elsloo*, 191 Wn.2d at 807; *see also* RCW 4.44.170; RCW 2.36.110; CrR 6.5. Bias can either be implied or actual. RCW 4.44.170. Actual bias is defined as "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2).

While it was not cited by any of the parties on appeal, the controlling case on this question is *Sassen Van Elsloo*. There, the court held that the "dismissal of an impaneled juror for bias requires the same findings as dismissal of a potential juror for bias—proof that the juror has formed a biased opinion and, as a result, cannot try the case impartially." 191 Wn.2d at 808. The Supreme Court adopted the definition of actual bias for application to impaneled jurors: "the challenging

party must prove (1) that the impaneled juror has formed or expressed a biased opinion and (2) that 'from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially.'" *Id*. at 810 (quoting RCW 4.44.190). A jury is also presumed to follow the court's instructions and this presumption will prevail until it is overcome by a contrary showing. *See State v. Stein*, 144 Wn.2d 236, 247, 27 P.3d 184 (2001); *State v. Keend*, 140 Wn. App. 858, 868, 166 P.3d 1268 (2007).

Here, we conclude that the trial court did not err when it declined to dismiss the impaneled juror. While Elaster contends that juror 11 "was herself witness to events" and the trial court's failure to dismiss her constitutes structural error, the "events" that juror 11 witnessed were not related to the criminal behavior before the jury. *Winborne* is not sufficiently similar, so the result should not be the same. Elaster and Miller's rights to confront adverse witnesses were not implicated the way Winborne's was. The defense attempt to stretch the application of *Winborne* fails.

Juror 11 only witnessed an incident that *could* have suggested A.J.O. was not being truthful under oath. However, careful reading of both A.J.O.'s testimony and juror 11's characterization of the event in the parking garage suggests the matter was not as straightforward as portrayed in briefing from the appellants. During the State's cross-examination of A.J.O., the following exchange occurred:

> [State]: And you don't currently have a driver's license. Is that right?
>
> [A.J.O]: I'm getting my restricted permit right now.
>
> [State]: But if you need to go somewhere, people need to give you rides. Is that right?

[A.J.O]: Yeah.

While A.J.O. admitted that he was in the process of applying for a driving permit, he did not affirmatively state that he never drove himself places. The State did not directly ask A.J.O. whether he ever drove a car, irrespective of whether he had a permit. While the bailiff did assert that juror 11 had "indicated [the issue] had to do with a witness and mentioned something about being truthful under oath," juror 11 herself did not frame the issue that way when questioned by the court. After describing what she had seen, she simply said, "I'm not sure if this is an important piece of information. I just thought it, I thought that I should bring that to your attention." The court consulted with counsel at sidebar and, after juror 11 was no longer in the courtroom, heard from the parties before recalling juror 11 for further inquiry and to give curative instructions. The judge then took further argument from the parties before ruling and ultimately noted,

> She was quite adamant—because that may not have come through—that she could disregard this information. She's followed the court's instructions. Frankly, she brought this to the court's attention. Some jurors may not have, to be honest. I'm convinced based on her demeanor and how quickly she answered that she will put this aside.

As such, the court's ruling to deny the motions of counsel for both defendants to dismiss juror 11 was based in part on this express finding that she was credible.

The defense argues that the prejudice here stems from the fact that juror 11 observed an occurrence that caused her to believe that A.J.O. was not a credible witness and the manner by which the issue was framed when alerting the bailiff is evidence of that prejudice. The State misses the crux of the defense

assignment of error by focusing on the fact that a misdemeanor driving offense is not an impeachable offense, particularly where there is no conviction. But that is not what appellants assert here. Their contention is that despite the fact that the record is clear A.J.O. never stated in his testimony that he never drove a car, juror 11 interpreted or recalled that testimony in such a way that she believed that she had caught him lying under oath and felt it was a sufficiently significant issue such that she needed to alert the judge that a witness may have lied on the stand.

While this court must presume that jurors follow the instructions of the court, the defense contends that the mere fact that juror 11 notified the court rebuts that presumption. This is incorrect. Juror 11's action demonstrates that she adhered to the court's initial jury instructions that specifically directed the jurors to notify the bailiff if they were uncertain about outside information. Among the instructions provided to the jury at the start of trial, the judge expressly commanded the following with regard to outside information:

> It is your duty as a juror to decide the facts in this case based upon the evidence presented to you in this trial. Evidence is a legal term. It includes testimony of witnesses, documents, and physical objects.
> . . . .
> It's essential to a fair trial that everything you learn about this case comes to you in this courtroom and only this courtroom. You must not allow yourself to be exposed to outside information about this case.
> . . . .
> You need to keep your mind free of outside influences, so that your decision will be based entirely on the evidence presented during the trial, and on my instructions to you about the law.
> . . . .
> If you become aware that you or another juror has been exposed to outside information, please privately notify [the bailiff]. Don't discuss the matter with other jurors.

After a probing inquiry by the court, juror 11 received additional curative instructions from the judge and unequivocally stated that she could follow them. She affirmed that she would not consider her observations of A.J.O. driving the car in her assessment of the testimony, or the case broadly, and repeatedly committed to following the judge's instruction on the matter. The court found her to be credible throughout her entire examination on the issue. However, the defense asserts that the fact that juror 11 appeared to have already made a conclusion about A.J.O.'s truthfulness, based on consideration of information obtained outside the courtroom, establishes that she did not follow the court's preliminary instructions on that precise topic from the start of trial.

The record, however, does not demonstrate that juror 11 failed to follow either the trial court's general jury instructions or specific curative instructions. The question then becomes whether the inquiry and rehabilitation by the court was sufficient under the circumstances, particularly in light of its finding that juror 11 was credible on this subject. Under *Sassen Van Elsloo*, the required standard dismissal of a juror is that the juror expressed or formed a biased opinion and cannot try the issue impartially. 191 Wn.2d at 808. Here, the defense has not established that juror 11 could not have disregarded her biased opinion about A.J.O.'s truthfulness and try the case impartially. In briefing, all parties argue at length about the significance of A.J.O.'s testimony and its potential effect on juror 11. Elaster and Miller imply that the court retained juror 11 primarily to avoid having to declare a mistrial due to insufficient jurors, suggesting that dismissing juror 11 was otherwise necessary. The record does show that the judge had concerns

about the ability to proceed because juror 9 had been excused for a medical reason, leaving the court without any alternate jurors. However, the trial judge has discretion in deciding whether to retain or dismiss a juror and, here, did not necessarily have to decide between retaining juror 11 so that the trial could proceed and A.J.O.'s impact as an important defense witness.

In *Sassen Van Elsloo*, the court held that "[t]he importance of a witness alone is not a proper basis on which to dismiss an impaneled juror . . . if the record does not indicate that the juror displayed actual bias." *Id.* at 810. A.J.O. was indeed a significant defense witness who testified that he slept in the living room and did not observe Miller entering the home during the night, or entering the bedroom with Elaster and A.M.O. where she alleged the abuse occurred. Nonetheless, Elaster and Miller do not demonstrate that juror 11 displayed actual bias that affected her views on the merits of A.J.O.'s testimony, particularly after being directly instructed to do just that. A mere possibility of bias is not enough. *Id.* at 810. It is reasonable in light of the court's finding on her credibility to presume that juror 11's initial concern about the truthfulness of A.J.O.'s testimony did not make a difference in her determination of his credibility as a witness after the court told her plainly, "You're not to consider this in evaluating the evidence in this case, evaluating any particular testimony, and you're not to discuss it with the jurors. So that's my—I'm ordering you to do that, but now I need to ask you, can you follow that instruction?" After juror 11 responded, "Yes, Your Honor," the court continued, "Okay. And so you understand this has to be not considered by you at all in making your decision in this case?" Juror 11 again responded, "Yes, Your Honor." Further,

while A.J.O. was an important defense witness, he acknowledged during his testimony that it was possible he may not have noticed people entering the house when he was asleep and another witness testified that she did enter and exit the house when A.J.O. was sleeping in the living room which suggested it was possible for Miller to have done so as well. As such, there was evidence independent of juror 11's observation of A.J.O. driving that called his credibility into question regarding his observations in the home. The trial court did not abuse its discretion when it denied the defense motions to dismiss juror 11.

II.     Right To Present a Defense

Elaster assigns error to the trial court's ruling to exclude evidence that A.M.O. had made allegations against other people besides Miller and Elaster and other children with whom A.M.O. resided also made allegations of abuse against others. She specifically claims that the exclusion of this evidence violated her right to present a defense as it showed that Spears had created "an environment of constant disclosure" of purported sexual abuse. We apply a two-part analysis to determine if a defendant's right to present a defense has been violated. *State v. Jennings*, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022). First, any evidentiary ruling is analyzed for abuse of discretion. *State v. Arndt*, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019). "'A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons.'" *State v. Bartch*, 28 Wn. App. 2d 564, 590-91, 537 P.3d 1091 (2023) (quoting *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007)), *review denied,* 2 Wn.3d 1026 (2024). If the reviewing court concludes that the evidentiary ruling was not

an abuse of discretion, the analysis proceeds to the second step: de novo review to determine whether the defendant's rights under the Sixth Amendment to the United States Constitution were violated. *Jennings*, 199 Wn.2d at 58; *see also Arndt*, 194 Wn.2d at 797-814. Here, the trial court considered proffered defense evidence under ER 403 which "allow[s] exclusion of relevant evidence if, inter alia, 'its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue or misleading the jury.'" *State v. Orn*, 197 Wn.2d 343, 353, 482 P.3d 913 (2021) (quoting ER 403).

A.M.O. and her siblings had resided with their maternal uncle Reginald and Spears for a few years before the abuse at issue here occurred. Elaster's three younger children, A.J.O, A.M.O., and A.A.O., returned to Spears' home in June 2018 after living with Elaster at Anderson's home. Spears had cared for A.M.O. and her siblings, along with her own children and others, when they were in her home. A.M.O. disclosed the abuse to Spears, who then informed Reginald.

Elaster avers that evidence of A.M.O.'s allegations of abuse against a number of other people, and Spears' concerns after a report of a "bad dream" by another child in Spears' care, was essential to the defense theory that Spears created "an environment of constant disclosure" in her home. The defense sought to introduce evidence of additional allegations of sexual abuse made by A.M.O. that named a maternal "uncle" Clifton Elaster,[6] two men who had lived on the same property as A.M.O. and Elaster, Brian Moses and Curtis Carbaugh, and "Frank,"[7]

---

[6] As with Reginald, we use Clifton's first name for clarity.

[7] This "Frank" is a different person than Frank Anderson Jr., Elaster's former partner, and Frank Anderson Sr., the owner of the home where the charged incidents of abuse occurred.

a friend of A.M.O.'s older brother, Anthony. The defense also sought to present a report from another child in Spears' care, M.R., that "a monster used to come and touch her at night" as an example of disclosure that Spears interpreted as sexual abuse. Defense counsel for both Miller and Elaster offered this evidence to "round out how this child's story grew and evolved and shed light on her state of mind while in the custody of Reginald and Spears." The defense intended to have Carbaugh and Moses testify and anticipated that they would each deny the allegations.

The trial court ruled that the evidence of these other allegations was inadmissible. First, ruling on the admission of the allegations against Clifton and the teenager Frank, the trial court said,

> To the extent when one can try to make an argument that they are admissible somehow to show the circumstances of where [A.M.O.] was living, I have to apply a 403 and say, you know, at some point there is—the probative value of this evidence where it can't even be—there is no evidence they're false is relatively low. And the injecting additional claims, I think, [t]he [c]ourts have recognized about sexual assault, alleged sexual assault on the victim. The probative value is relatively low. And the prejudice in getting into these other areas is high.

Then, ruling on the admissibility of the allegations against Carbaugh and Moses, the court emphasized that there was little probative value in having two uncharged alleged perpetrators of sexual assault come and testify that A.M.O.'s accusations against them were false, because all they could offer was testimony as to the falsity of those allegations without any corroborating evidence. The court further noted that "the probative value of this evidence is low and the prejudicial impact is relatively high, in terms of both confusing the juror, extending the trial into issues that aren't directly relevant".

In making this determination, the court referred to the reasoning set out in *State v. Lee*. 188 Wn.2d 473, 396 P.3d 316 (2017). There, our Supreme Court ruled that the trial court did not abuse its discretion when it prohibited Lee from questioning the victim about a prior accusation of rape that she later admitted was false. *Id.* at 486. Lee was allowed to cross-examine the victim about a false report she had made to police but was barred from mentioning that it was a rape allegation. *Id. a*t 487. Further, the Supreme Court noted that the victim's "prior false rape accusation had minimal probative value because it did not directly relate to an issue in the case. Rather than demonstrate a specific bias or motive to lie, which would be highly probative, the evidence invited the jury to infer that [the victim] is lying because she has lied in the past." *Id*. at 488.

The trial court here also referred to *State v. Demos*, 94 Wn.2d 733, 619 P.2d 968 (1980). In *Demos*, the defendant challenged the decision of the trial court to exclude "two prior rape complaints by the victim, reports which the defendant characterize[d] as arguably false." *Id.* at 733. The trial court in *Demos* grounded this ruling in the "rape shield law"[8] and its finding that "apart from the statute, the remoteness of time and the prejudicial effect of this evidence outweighed any logical connection to her credibility about the current charge." *Id.* at 736. Our Supreme Court upheld the exclusion, explaining that the "trial court did not abuse its discretion in denying admission of evidence which had no tendency to prove anything in the dispute and which would have been highly prejudicial." *Id.* at 737.

---

[8] RCW 9A.44.020

Here, the trial court was well within its discretion when it excluded evidence relating to other allegations made by A.M.O. By their own admission, the defense attorneys sought admission of this evidence as a gambit to imply that Spears created what Elaster's trial counsel characterized as "an environment of constant disclosure." The decision to exclude the other allegations was entirely reasonable because, as in *Lee* and *Demos,* these particular allegations against people other than the co-defendants would have been highly prejudicial, of minimal probative value, and risked confusing the issue; all proper grounds for exclusion under ER 403. As the case against Elaster and Miller depended heavily on testimony from the victim herself, the defense sought the admission of this evidence in order to more clearly illustrate the circumstances in which A.M.O.'s allegations arose. However, it had limited probative value for that proposition and the trial court did not err when it excluded it.

Having determined that the initial evidentiary ruling was not an abuse of discretion, we move to the second step of the *Jennings* test. We consider violations of a defendant's constitutional right to present a defense de novo. *Jennings*, 199 Wn.2d at 58*; Bartch*, 28 Wn. App. 2d at 590. Here, Elaster and Miller's rights to present a defense were not unduly burdened because they were able to develop the desired theme during their cross-examination of Spears. Elaster states that they sought to admit the evidence of other allegations to paint a picture of the Spears household environment as one that "produced accusations from A.M.O. against a large number of men" and turned the story of another child in the home, M.R., about a "monster" into another disclosure of sexual abuse.

During defense cross-examination of Spears, counsel for Miller asked a number of questions to develop the shared defense theory that Spears was soliciting allegations from the children in her care. For example, Spears testified that after she had questioned A.M.O. about an allegedly graphic story A.M.O. had written, Spears was not satisfied with answer she received from the child. Spears also testified that she took a phone away from A.A.O. for communicating with someone "older than her age at that time." Spears testified she would routinely check in with the children to see how they were fairing; the defense's line of questioning seems intended to suggest that Spears could not leave an issue alone when she had a feeling something was wrong. Counsel also questioned Spears about the "birds and the bees" discussion she had with all the children. Defense inquired about Spears' household rule that women should bend at the knees, rather than bending over at the waist, and concluded with questions about Spears feeling that there was inappropriate stuff happening between the children. The record demonstrates that the defense had ample opportunity to develop its theme regarding Spears' alleged preoccupations. Elaster's right to present a defense was not violated.

III.    Ineffective Assistance of Counsel

Elaster next argues that her trial counsel rendered constitutionally ineffective assistance by failing to object to what she characterizes as the State's generic tailoring assertion when cross-examining Miller. We disagree.

The Sixth Amendment and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel. U.S. CONST.

- 18 -

amend. VI; WASH. CONST. art. I, § 22. We review ineffective assistance of counsel (IAC) claims de novo. *State v. Jones*, 183 Wn.2d 327, 338-39, 352 P.3d 776 (2015).

The United States Supreme Court set out a two-pronged test for evaluating whether a defendant had constitutionally sufficient representation in *Strickland v. Washington*. 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *see also State v. Cienfuegos*, 144 Wn.2d 222, 226, 25 P.3d 1011 (2001). Under *Strickland*, the defendant must show both deficient performance and resulting prejudice to prevail on an ineffective assistance claim. 466 U.S. at 687. In order to prevail on an IAC claim based on failure to object as presented here, the defendant must demonstrate that the objection would have been sustained. *In re Det. of Monroe*, 198 Wn. App. 196, 205, 392 P.3d 1088 (2017). Because Elaster's IAC challenge is premised on a claim of failure to object to a generic tailoring assertion by the State, we first consider whether such an allegation was present.

A.    State's Assertion of Tailoring

"The right to 'appear and defend in person,' to testify on [their] own behalf, and to confront witnesses against [them]" are guaranteed by the Sixth Amendment and article I, section 22. *State v. Berube*, 171 Wn. App. 103, 114, 286 P.3d 402 (2012) (quoting WASH. CONST. art. I, § 22). We review alleged constitutional violations de novo. *State v. Wallin*, 166 Wn. App. 364, 367, 269 P.3d 1072 (2012). A claim of "tailoring" suggests that the defendant adjusted their testimony to match the evidence they heard during trial. *State v. Carte*, 27 Wn. App. 2d 861, 871, 534

P.3d 378 (2023), *review denied*, 2 Wn.3d 1017 (2024). Tailoring arguments can be "specific" or "generic." *Id*.; *see also Berube*, 171 Wn. App. at 115-17. The tailoring arguments are "specific" if "derived from the defendant's actual testimony" and "generic" "if based solely on the defendant's presence at the proceeding and not based on the defendant's direct examination or cross-examination." *Carte*, 27 Wn. App. 2d at 871.

In *Carte*, this court noted that a majority of the U.S. Supreme Court held in *Portuondo v. Agard,* 529 U.S. 61, 73, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000) that tailoring arguments do not violate the Sixth Amendment right to be present at trial and confront witnesses, but Justice Ginsburg dissented and argued that tailoring allegations should only be raised during cross-examination, rather than in closing arguments, in order to avoid constitutional violation. *Id*. at 871-72; *see also State v. Holmes*, 31 Wn. App. 2d 269, 289, 548 P.3d 570, *review denied*, 3 Wn.3d 1024 (2024). *Carte* further explained that, in *State v. Martin,*[9] our state Supreme Court expressly adopted Justice Ginsburg's dissent in *Portuondo* and held that a specific tailoring argument is appropriate during cross-examination, but "'a comment in closing argument "tied only to the defendant's presence in the courtroom and not to his actual testimony"' violates the right to be present at the trial and confront witnesses." *Carte*, 27 Wn. App. 2d at 872 (quoting *Martin*, 171 Wn.2d at 535 (quoting *Portuondo*, 529 U.S. at 77 (Ginsburg, J., dissenting))).

Here, Elaster argues that her attorney was ineffective when he failed to object to the State's generic tailoring claim during its cross-examination of Miller.

---

[9] 171 Wn.2d 521, 252 P.3d 872 (2011).

On appeal, Elaster cites *Carte*, but frames the issue as one of generic tailoring. Review of the actual interaction at trial, through the framework of the definitions set out in case law, demonstrates that this is incorrect. The following exchange occurred during Miller's cross-examination:

[State]: You've had a lot of time to think about what you're going to say today, haven't you, Mr. Miller?

[Miller]: Yeah. I'm telling you the truth.

[State]: And you've had a lot of time to look over the police reports like you talked about earlier?

[Miller]: The discovery when it was given to me, yes.

[State]: And you've had a lot of time to look back at your own statements, haven't you?

[Miller]: Some of them.

[State]: When you were interviewed by Detective Rossmeier of the Kent Police Department, he asked you were you and [Elaster] together in a bedroom with A.M.O, and you told him no. Isn't that right?

[Miller]: I can't recall exactly what my testimony was.

[Elaster's counsel]: Which page and line?

[State]: The page number is 32, and the lines are 6 through 8. If I could have this marked.

CLERK: Exhibit 37 is marked.

[State]: Mr. Miller, I'm handing you what's been marked as State's Exhibit 37 entitled "Transcript of Billy Miller Interview." I'd ask that you look at page 32 and read to yourself lines 6 through 8.

[Miller]: May I please get my glasses?

[State]: Yes.

[Miller]: Page 32?

> [State]: Yes. Lines 6 through 8. Does that refresh your memory about what Detective Rossmeier asked you and what your answer was?
>
> [Miller]: Yes.
>
> [State]: What did he ask you?
>
> [Miller]: He asked me if me, [Elaster], and [A.M.O.] was ever in bed together.
>
> [State]: Alone in a bedroom together. Is that right?
>
> [Miller]: Yes.
>
> [State]: And what was your answer?
>
> [Miller]: No.

The State's tailoring argument stems from Miller's statement to the detective and directly relates to the discrepancies between that earlier narrative and his trial testimony, making it *specific* tailoring rather than generic. Miller opened the door to the State's line of questioning on tailoring when he admitted that he reviewed the police report containing his prior statement to Rossmeier. During direct examination, Miller twice volunteered that he had read the police reports during the pendency of the case:

> [Stimmel, Miller's defense counsel]: Do you know—you've heard about this story that [A.M.O.] wrote, correct?
>
> [Miller]: I've heard about it. I've never seen it.
>
> [Stimmel]: This story that—is that the story that started this case as far as you know?
>
> [Miller]: From what I've read in the police reports and everything, that story is what caused everything.
>
> [State]: Your Honor, objection.

COURT: Sustained.

[Stimmel]: But you've never seen this story?

[Miller]: No.

[Stimmel]: Do you know anybody who's seen it except [A.M.O.]?

[Miller]: From what I was told in the police report and what I know from this case, there's been five people that know about this story.

[State]: Your Honor, objection, hearsay. Move to strike.

COURT: Sustained. I'll strike the last statement.

Unsolicited, Miller included in his answers during direct examination references to evidence he learned about through his review of the discovery prior to trial. The prosecutor's questioning about this, and insinuation that Miller had tailored his testimony based on the discovery he had read, is consistent with the rule articulated in *Martin* and relied upon in *Carte*. As Elaster pointed out in her opening brief, the State did not present any physical evidence in support of the charges it brought, and the jury's verdicts hinged on the credibility of both Miller and Elaster. As such, it was reasonable and fair for the prosecutor to ask questions that would help the jury to understand whether Miller was honestly recounting what happened or had tailored his testimony at trial.

B.      Failure To Object

Again, to demonstrate IAC based on a failure to object, a defendant must show that the objection would have been sustained in order to meet the prejudice standard under *Strickland*. *See Monroe*, 198 Wn. App. at 205; *State v. Fortun-Cebada*, 158 Wn. App. 158, 172, 241 P.3d 800 (2010). Given the facts of Miller's

testimony, it was reasonable for the prosecution to ask questions designed to clarify for the jury whether Miller was truthful and the specific tailoring assertion here was proper under *Martin*. Accordingly, Elaster is unable to establish that any objection by her attorney to the State's tailoring argument against Miller would have been sustained. Elaster's trial counsel was not deficient for failing to object to a permissible claim of tailoring. Under *Strickland*, both deficient performance and prejudice must be proven, and without one, the ineffective assistance challenge fails. 466 U.S. at 687. Accordingly, Elaster does not carry her burden on her claim of IAC for failure to object.

IV.     Community Custody Conditions

Next, Elaster challenges two community custody conditions imposed by the trial court and set out in appendix H to her judgment and sentence (J&S) as one of several "special conditions" for sex offenses: condition 5, which restricts dating relationships and requires her to disclose her status as a sex offender to potential intimate partners, and condition 8, which requires she consent to random searches by the Department of Corrections (DOC). The State asserts that condition 5 is crime-related and not unconstitutional and that condition 8 is not yet ripe for review. We agree with the State on both points.

A.     Condition 5

Elaster contends that the requirement to disclose her sex offender status prior to any sexual contact with others is not crime-related and violates her

constitutional right to free speech, which includes the right to refrain from speaking. We disagree.

Condition 5 reads as follows:

Inform the supervising [community custody officer] and sexual deviancy treatment provider of any dating relationship. Disclose sex offender status prior to any sexual contact. Sexual contact in a relationship is prohibited until the treatment provider approves of such.

Both Divisions One and Three of this court have held in several published opinions that an identical condition was both crime-related and constitutional. *See State v. Lee*, 12 Wn. App. 2d 378, 402, 460 P.3d 701 (2020); *State v. Gantt*, 29 Wn. App. 2d 427, 456-57, 540 P.3d 845, *review denied*, 3 Wn.3d 1002 (2024); *In re Pers. Restraint of Sickels*, 14 Wn. App. 2d 51, 60-61, 469 P.3d 322 (2020); *State v. Autrey*, 136 Wn. App. 460, 468, 150 P.3d 580 (2006). In *Lee*, this court noted that the "right not to speak is protected both by the First Amendment to the United States Constitution and by article I, section 5 of the Washington Constitution. However, '[a]n offender's usual constitutional rights during community placement are subject to SRA[10]-authorized infringements.'" 12 Wn. App. 2d at 401-02 (*quoting State v. Hearn*, 131 Wn. App. 601, 607, 128 P.3d 139 (2006)). The panel in *Sickels* concluded that only the third sentence of the challenged condition was subject to the "crime-relatedness" standard under RCW 9.94A.703(3)(f), and further held that it is reasonably related to the safety of the community and narrowly tailored to prevent future harm. 14 Wn. App. 2d at 60-61.

---

[10] Sentencing Reform Act of 1981. Ch. 9.94A RCW.

Elaster's freedom is restricted under community placement as it is during incarceration. *See State v. Ross*, 129 Wn.2d 279, 287, 916 P.2d 405 (1996). This condition has been repeatedly examined in response to similar arguments and held to be constitutional. We reject Elaster's challenges to condition 5.

B.      Condition 8

Elaster also brings a preenforcement challenge to another community custody condition, but it is not yet ripe for appellate review. Condition 8 states as follows:

> Consent to DOC home visits to monitor compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of the residence in which the offender lives or has exclusive/joint control/access.

Our Supreme Court considered whether a similar community custody condition was ripe for review in *State v. Cates*. 183 Wn.2d 531, 533-34, 354 P.3d 832 (2015) ("You must consent to [DOC] home visits to monitor your compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of the residence in which you live or have exclusive/joint control/access, to also include computers which you have access to." (Alteration in original.)). It relied on a number of cases defining an issue as ripe for review "'if the issues raised are primarily legal, do not require further factual development, and the challenged action is final.'" *Id.* at 534 (internal quotation marks omitted) (quoting *State v. Sanchez Valencia*, 169 Wn.2d 782, 786, 239 P.3d 1059 (2010). In rejecting Cates' challenge as not yet ripe, the court explained that "[s]ome future misapplication of the community custody condition might violate article I, section 7

[of our state constitution], but that 'depends on the particular circumstances of the attempted enforcement.' Further factual development is therefore needed—the State must attempt to enforce the condition by requesting and conducting a home visit after [the defendant] is released from total confinement." *Id*. at 535 (citation omitted) (quoting *Sanchez Valencia*, 169 Wn.2d at 789).

Elaster cites two unpublished cases, *State v. Franck*[11] and *State v. Daniels,*[12] in support of her position on this issue, but avoids *Cates* entirely. However, neither of these cases is controlling on the issue of ripeness. Further, this court recently rejected *Franck* as authority on this same sort of challenge in *Holmes.* 31 Wn. App. 2d at 293 ("*Franck* is not controlling or persuasive on the issue of ripeness."). More critically, Elaster fails to explain why this court should follow unpublished intermediate appellate opinions over controlling case law from our Supreme Court. We follow *Cates* and conclude that this condition is not ripe for review.

V.      Legal Financial Obligations

Finally, Elaster asserts and the State concedes that this court should remand for the trial court to strike both the victim penalty assessment and DNA collection fee from her J&S based on its finding of indigency at sentencing and amendments to the relevant statutes that became effective while her appeal was pending. We accept the State's concession and remand for correction of the J&S

---

[11] No. 51994-1-II (Wash. Ct. App. Feb. 4, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2051994-1-II%20Unpublished%20Opinion.pdf.

[12] No. 54094-1-II (Wash. Ct. App. Aug. 3, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2054094-1-II%20Unpublished%20Opinion.pdf, *review denied*, 198 Wn.2d 1035 (2022).

to reflect the current law regarding the imposition of legal financial obligations on indigent defendants.

Affirmed in part, reversed in part, and remanded for the trial court to strike the legal financial obligations.

WE CONCUR: