# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58850-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ERIC C. BANFIELD, | |
| Appellant. | |

CHE, J.—Eric Banfield appeals his convictions for first degree burglary, residential burglary, second degree assault, felony violation of a court order, and unlawful imprisonment, all as crimes of domestic violence, as well as bail jumping.

Banfield assaulted KC, who had a no-contact order against Banfield. The State charged Banfield with several crimes. At trial, because of Banfield's outbursts, the trial court removed him from the courtroom and set up another courtroom where he could watch the proceedings and speak to his attorney directly through a microphone system. The next day, the court denied Banfield's request to return to the courtroom. The State introduced Banfield's prior convictions against KC. Later, a corrections officer, despite not knowing what Banfield looked like, testified that Banfield sent a text message to a third party through the jail's electronic messaging system. In closing argument, the State argued, without objection, that Banfield's text message admitted to committing a crime. The jury found Banfield guilty as charged and imposed certain legal financial obligations (LFOs).

Banfield argues that he was denied his constitutional right to be present at trial, that his attorney provided ineffective assistance by failing to object when the corrections officer testified that Banfield sent the text message and when the State argued in closing that the text message was an admission of a crime, that the trial court improperly admitted evidence of Banfield's prior convictions, and that the crime victim penalty assessment (VPA) and domestic violence assessment (DVA) should be stricken from his judgment and sentence. The State concedes that the VPA should be stricken. In his statement of additional grounds (SAG), Banfield claims judicial misconduct and ineffective assistance of counsel.

We hold that the trial court did not violate Banfield's right to be present at trial, Banfield's ineffective assistance of counsel claim fails, the trial court did not abuse its discretion in admitting evidence of Banfield's prior acts of domestic violence, the trial court did not err in imposing the DVA but the VPA should be stricken, and Banfield's SAG claims are not reviewable or lack merit.

We affirm Banfield's convictions but remand to the trial court to strike the VPA from his judgment and sentence.

## FACTS

### BACKGROUND

Banfield and KC dated for around ten years and had a "rocky" relationship. Rep. of Proc. (RP) at 241. Despite the "drinking and the violence" in their relationship, KC did not leave Banfield because she loved him. RP at 242. In March 2020, the Kelso Municipal Court entered a no-contact order prohibiting Banfield from, among other things, (1) causing, attempting, or

threatening to assault or cause bodily injury to KC, (2) contacting KC, and (3) knowingly entering, remaining, or coming within 1,000 feet of KC's residence. In August 2020, the Cowlitz County Superior Court entered a domestic violence no-contact order prohibiting Banfield from (1) causing, attempting, or threatening to assault or cause bodily injury to KC, (2) contacting KC, and (3) knowingly entering, remaining, or coming within 100 yards of KC's residence.

In May 2021, officers responded to a domestic dispute at KC's second floor apartment. They were aware there was a no-contact order protecting KC from Banfield.

Officers announced their presence at KC's front door, heard a physical altercation ensuing between at least two people, and then heard a distressed female voice yelling "[h]elp me" and "[h]e won't let me go." RP at 345-47. Because no one opened the front door, officers eventually kicked it in to gain entry. Upon entering, they located KC and searched the apartment, including the balcony, for another person. Officers were advised that a male had jumped from KC's balcony. They eventually found Banfield laying in bushes, 175 feet away from KC's apartment complex.

KC told officers that Banfield had hit her face and prevented her from opening her front door. KC had cuts, marks, and blood on her face. Later, while these matters were pending, Banfield knowingly failed to appear for a subsequent personal appearance as required by the trial court.

The State charged Banfield by third amended information with first degree burglary, residential burglary, second degree assault, felony violation of a court order, unlawful

imprisonment, and misdemeanor violation of a court order, all as crimes of domestic violence, as well as bail jumping.

PROCEDURAL HISTORY

In November 2021, the State gave notice under ER 404(b) that it intended to admit evidence of Banfield's prior domestic violence convictions against KC, which included third and fourth degree assaults, harassment, and felony violation of a no-contact order. In its motion, the State said it sought to admit this evidence at trial to show Banfield's acts "were not committed by mistake or accident; to show a motive, intent and a common scheme or plan[;] [and] to help the jury asses[s] the victim's credibility." Clerk's Papers (CP) at 8. At the motion hearing, the State argued the evidence was admissible to show "lack of consent" for unlawful imprisonment and that Banfield "knowingly restrained [KC] without her consent."[1] RP at 730. Banfield objected, arguing such evidence would be highly prejudicial and minimally probative because anticipated testimony about the physical violence KC experienced during the incident and her injuries would be enough evidence to argue she was unlawfully imprisoned. The trial court granted the State's motion in limine and reserved on whether to admit evidence of Banfield's prior arrest for violation of a no-contact order.

The trial court commenced three trials in this case. The first trial in October 2022 ended in a mistrial because there were not enough available jurors. During the second trial in January 2023, Banfield renewed his prior objection to the court's ruling admitting prior domestic violence convictions against KC. In addition, both parties' attorneys agreed to avoid mentioning

---

[1] The State relied on *State v. Ashley*, 186 Wn.2d 32, 375 P.3d 673 (2016).

any rape allegation, which was not investigated and not charged due to KC's reluctance to participate in any rape investigation. However, during an officer's testimony, the prosecutor asked, "Did someone do that to [KC]? What did [KC] say to you?" RP at 877. Banfield interrupted the testimony by screaming, "That I raped her. That's what she said." RP at 877.

Defense counsel moved for a mistrial, noting that it was in Banfield's best interest for the jury to not hear about the uncharged rape allegation despite what Banfield believed, and the State agreed that a mistrial was appropriate. The court granted defense counsel's request for a mistrial.

The State then filed a motion in limine for the trial court to notify Banfield of removal from the proceedings if Banfield engaged in further disruptive outbursts in the next trial, stating:

> In the prior trial, after taking excessive, even obsequious efforts by the Court and both counsel to avoid discussion of rape allegations that were not investigating thoroughly due to [KC's] wishes, Mr. Banfield yelled at the top of his lungs that [the] victim said he raped her. This was during the final moments of direct examination of the State's final witness. The effect of the outburst halted proceedings and eventually resulting in a mistrial.
>
> Mr. Banfield's efforts were deliberate. In fact, following the end of the proceedings, he informed the assigned jailer that it was his intention to cause a mistrial. [Attachment A]. The State, defense, and the Court have endeavored to ensure Mr. Banfield receives a fair trial. However, his calculated actions risked those efforts, indicating his utter lack of concern for the trial process. Because of those actions, the State holds a justified concern Mr. Banfield will again engage in a disruptive outburst during the trial.
>
> The Court is entitled to remove a defendant from the courtroom. However, the Court must first admonish him that his conduct could lead to removal. That conduct must be severe enough to justify removal. The trial court must express a preference for the least severe alternative that will prevent the defendant from disrupting the trial. If Mr. Banfield is removed from the courtroom, he must be

allowed to reclaim his right to be present upon assurances that his conduct will improve. *State v. Chapple*, 145 Wn.2d 310, 320, [36 P.3d 1025], (2001).[2]

CP at 70-73. At a hearing on the motion, the State reiterated the *Chapple* guidelines concerning removal of a defendant from the courtroom, including the opportunity for a defendant to return to the courtroom. The court admonished Banfield stating that he would be removed if he disrupts his next trial.

THIRD TRIAL

During pretrial colloquy with the court for Banfield's third trial in February 2023, defense counsel noted Banfield understood the court could potentially remove him from the courtroom for the duration of his trial should he have an outburst, and Banfield notified defense counsel he would do his best to not have any outbursts.

Witnesses testified consistently with the facts above. In addition, KC testified that Banfield had held her down, poured alcohol down her throat, and hit her face. She testified that she was scared at the time of the incident because Banfield was "scary" given the "violence and abuse." RP at 248. An officer testified that KC told her "she was scared, didn't want any retaliation [from Banfield], and was scared that [Banfield] would kill her the next time." RP at 299.

---

[2] Attachment A is a jail incident report. In the report, an officer noted that he told Banfield he believed Banfield interrupted the second trial on purpose to cause a mistrial "and [Banfield] said yes." CP at 73.

The trial court then admitted evidence of Banfield's four prior domestic violence convictions against KC, which included convictions for fourth degree assault, harassment, third degree assault, and felony violation of a no-contact order.

While KC testified, she denied remembering what she told law enforcement during the incident. Banfield interrupted and stated, "You said I raped you. Don't you remember that?" RP at 261. The State indicated it would make a motion, which the court acknowledged, before Banfield then stated, "She doesn't remember anything." RP at 261. The court removed the jury, the State moved to remove Banfield from the courtroom, and defense counsel moved for a mistrial. The court denied the motion for mistrial, stating:

> Mr. Banfield is in a position where I don't know if it's malingering, so he can continue to claim that his speedy trial rights are being violated.
>
> He claims that he wants all the truth to come forward. I can appreciate that. This is not the process where that would be afforded, and the approach that needs to be done.
>
> I do think that we're in a situation where he's aware of the rules that we need to operate under. He's refusing to operate under those rules.

RP at 265.

In response to the State's removal request, defense counsel asked the trial court to admonish Banfield again and "allow[] him to remain with the knowledge that [at] any further outburst, he would be removed." RP at 267. The court responded:

> I think this is the fifth time to trial. This is the at least second time that we're at jury and we're in a position that we're trying to get Mr. Banfield a fair trial before a jury of his peers. This is the second time that we're in that position and Mr. Banfield has shouted at the witness while they were testifying.
>
> . . . .

7

> I don't know what other method the Court can take to move this trial forward and not just continue to kick the can down the road, except to have [Banfield] not be present while we resume testimony and continue this case.

RP at 267-68. Defense counsel suggested placing Banfield in a different courtroom where he could watch the proceedings and use an interpreter device to speak with only his counsel as the trial continued. The court granted the State's motion to remove Banfield from the courtroom and set him up in the other courtroom.

When the court reconvened, a corrections officer relayed to the court a conversation he had with Banfield where Banfield "stated that he had informed his Defense Attorney that he could not hold his language, that he would potentially have an outburst, and that he would continue to have an outburst. 'By God's will,' he wants the truth out." RP at 272.

On the following day of trial, defense counsel asked the court to allow Banfield to return to the courtroom, stating that he was "well aware" why the court ruled to remove Banfield and that he "certainly [is] not going to make any promises to the Court or anything that there would not be a further outburst." RP at 329. The court denied Banfield's motion, acknowledging the significance of removing Banfield but that there were "sufficient warnings given." RP at 331.

Later, the State introduced the testimony of Captain Chris Moses of the Cowlitz Corrections Department. Captain Moses maintained jail records, including, among other things, phone records for inmates, inmate communications on digital tablets, and emails. Inmates had access to digital tablets through which they can communicate in real time email or text messages with friends and family. To send a message, Captain Moses explained that an inmate "log[s] into the system, typically with a PIN number. The device will take a phot[o] of that person that's

logging in." RP at 337. The photographs appear in the message records and "links that individual with the person who's using a tablet at that time." RP at 337.

The State showed Captain Moses a message sent from a tablet on August 23, 2022, which stated, "I'm guilty of DV four and DV four in violation of Restraining Order. Not burg one or res burg." RP at 338, 340. Captain Moses testified that it was a fair and accurate depiction of a message from Banfield. He further testified that he knew Banfield sent the message because his name was on it, there was a photo, and it looked like he was sending a message to Alan Banfield. Captain Moses stated he did not know what defendant Banfield looked like, but at a prior hearing, he confirmed Banfield was the person in the photograph and that this remained his opinion. Defense counsel did not object to Captain Moses's testimony.

Throughout the trial, defense counsel notified the court that he could hear Banfield, that Banfield could hear him, and that Banfield could communicate with him from the other courtroom.

The jury found Banfield guilty of first degree burglary, residential burglary, second degree assault, felony violation of a court order, and unlawful imprisonment, all as crimes of domestic violence, as well as bail jumping.[3]

The trial court sentenced Banfield and imposed a $500 VPA and $100 DVA.

Banfield appeals.

---

[3] The trial court found the first degree burglary and residential burglary convictions were the same criminal conduct and sentenced Banfield accordingly.

ANALYSIS

I.  RIGHT TO BE PRESENT AT TRIAL

Banfield contends that the trial court denied his constitutional right to be present at trial. Specifically, Banfield takes issue only with the trial court's application of the fourth guideline under *State v. Chapple*,[4] that the court did not notify Banfield that he may return if he could comport himself appropriately. We disagree that the trial court violated Banfield's right to be present.

A.    *Legal Principles*

A criminal defendant has a constitutional right to be present at their own trial. *State v. Davis*, 195 Wn.2d 571, 578, 461 P.3d 1204 (2020). However, this right is not absolute. *Id.* A defendant may expressly or impliedly waive their right to be present at trial if their waiver is knowing and voluntary. *Id.*

"[A] defendant's persistent, disruptive conduct can constitute a voluntary waiver of the right to be present." *Id.* Once lost, a defendant can reclaim this right "'as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.'" *State v. Thompson*, 190 Wn. App. 838, 843, 360 P.3d 988 (2015) (quoting *Illinois v. Allen*, 397 U.S. 337, 343, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970)).

A trial court has wide discretion when determining the appropriate way to handle a defendant's disruptive courtroom behavior. *Chapple*, 145 Wn.2d at 320. "No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations." *Allen*, 397 U.S.

---

[4] 145 Wn.2d 310, 36 P.3d 1025 (2001).

at 343. While the *Chapple* court recognized that the appropriate method for handling a disruptive defendant should be left to the trial court's discretion, it set out guidelines to assist trial courts in exercising their discretion. 145 Wn.2d at 320.

First, the trial court should warn the defendant that their conduct may lead to removal. *Id.* Second, their conduct must be severe enough to justify removal. *Id.* Third, the court should use the least severe alternative that will prevent the defendant from disrupting the trial. *Id.* Fourth, the court must allow the defendant to reclaim their right to be present upon assurances that their conduct will improve. *Id.* The fourth guideline may require varying degrees of trial court involvement in the reclamation. *See Id.* at 326 (holding that "the trial court's requirement that defense counsel speak with the defendant and report back to the court was appropriate in th[ose] circumstances and adequate to give the defendant an opportunity to reclaim his right to return.").

The *Chapple* court intended these guidelines to ensure trial courts exercise their discretion such that they afford defendants a fair trial "while maintaining the safety and decorum of the proceedings." *Id.* at 320. "The guidelines are not meant to be constraints on trial court discretion." *Id.*

B.      *The Trial Court Did Not Violate Banfield's Right to Be Present*

In *Chapple*, the defendant interrupted the trial court, became increasingly hostile, and then the court eventually removed him. *Id.* at 315-16. The court worked with defense counsel to find a way for Chapple to participate in the trial. *Id.* at 316. After considering corrections

11

officers' testimonies about Chapple's "size and extraordinary physical strength," the court excluded Chapple from the remainder of trial. *Id.* at 316-17.

The Supreme Court rejected Chapple's argument that the trial court erred by "not informing him, on the record, that he could return whenever he chose to conduct himself appropriately," instead holding that the trial court's "requirement that defense counsel speak with the defendant and report back to the court was appropriate [under the] circumstances and adequate to give the defendant an opportunity to reclaim his right to return." *Id.* at 324, 326.

Here, Banfield made two outbursts, one at his second trial in January 2023, which ended in a mistrial, and another at his third trial in February 2023. At his second trial, Banfield interrupted an officer's testimony by yelling that KC said he had raped her. The State then moved to remove Banfield from the courtroom in the upcoming third trial, citing the *Chapple* guidelines. In its written motion, the State indicated that an officer noted he told Banfield he believed Banfield interrupted the second trial on purpose to cause a mistrial "and [Banfield] said yes." CP at 73. At the motion hearing, the State reiterated the *Chapple* guidelines on the record, including the opportunity for a defendant to return to the courtroom. The court did not rule on the motion at the hearing, but notified Banfield of the risk of removal from the proceedings for similar behavior.

At his third trial, during KC's testimony, Banfield stated, "You said I raped you. Don't you remember that?" and "She doesn't remember anything." RP at 261. The trial court granted the State's motion to remove Banfield from the courtroom. When the court reconvened, a corrections officer informed the court that Banfield "stated that he had informed his Defense

Attorney that he could not hold his language, that he would potentially have an outburst, and that *he would continue to have an outburst*. 'By God's will,' he wants the truth out."  RP at 272 (emphasis added).

The next day, defense counsel asked the court to allow Banfield to return but stated that he "certainly [is] *not going to make any promises to the Court or anything that there would not be a further outburst* [from Banfield]."  RP at 329 (emphasis added).  The State noted Banfield made an outburst ending in a mistrial two weeks earlier, had been admonished earlier in the week and the week prior, and intended to continue having outbursts.  The court denied Banfield's motion, acknowledging the significance of removing him but that there were "sufficient warnings given."  RP at 331.

Though the trial court did not inform Banfield on the record that he could return to the courtroom if his conduct improved, like in *Chapple*, defense counsel's communications with Banfield and subsequent report to the court that he could not assure Banfield's behavior would improve, was appropriate under these circumstances and adequate to give Banfield an opportunity to reclaim his right to return.  145 Wn.2d at 326.  The trial court explained the gravity of Banfield's outbursts and anticipated that his disruptive behavior would continue given Banfield's history of outbursts in front of the jury.  Furthermore, in *Thompson*, we recognized that there is no requirement for defendants to receive daily reminders about the right to be present.  190 Wn. App at 844.        The *Chapple* court was clear that its four guidelines are not mandatory but rather are basic guiding principles. 145 Wn.2d at 320.  Banfield asserts that for the remainder of trial, the court did not inform him that he could return to the courtroom if his

conduct improved. However, while the trial court did not explicitly notify Banfield of the reclamation of his right to be present on the subsequent days of trial, that does not mean that the trial court violated Banfield's right to be present. Indeed, any reclamation would have required that Banfield commit to following the rules, and as his counsel admitted, Banfield was still "not going to make any promises to the Court or anything that there would not be a further outburst" on the second day of trial. RP at 329. As explained above, a trial court has wide discretion in determining the appropriate way to handle a defendant's disruptive courtroom behavior. *Chapple*, 145 Wn.2d at 320.

We conclude that the trial court did not abuse its discretion here, where there was no indication in the record that Banfield assured or would have assured his conduct would improve. Thus, we hold that the trial court did not violate Banfield's right to be present at trial when the court removed him from the courtroom and placed him in a different courtroom for the remainder of the trial with the ability to watch the proceedings and communicate directly with his counsel.

II. ADMISSION OF PRIOR CONVICTIONS

Banfield contends the trial court erred when it admitted evidence of his prior convictions. We disagree.

A.    *Legal Principles*

We review a trial court's decision to admit or exclude evidence under ER 404(b) for an abuse of discretion. *State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). A trial court

abuses its discretion when its decision is unreasonable or based on untenable grounds or reasons. *State v. Arredondo*, 188 Wn.2d 244, 256, 394 P.3d 348 (2017).

Under ER 404(b), evidence of a defendant's other crimes, wrongs, or acts is not admissible to prove their character and show that they acted in conformity with that character. ER 404(b); *State v. Gresham*, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). While ER 404(b) bars evidence of other misconduct to show a defendant's propensity to commit the crime charged, such evidence may be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).

Before a trial court admits evidence under ER 404(b), it must first "(1) find by a preponderance of the evidence the misconduct actually occurred, (2) identify the purpose of admitting the evidence, (3) determine the relevance of the evidence to prove an element of the crime, and (4) weigh the probative value against the prejudicial effect of the evidence." *Fisher*, 165 Wn.2d at 745. The trial court must generally conduct this analysis on the record, and if it admits the evidence, it must also give, upon request, a limiting instruction. *Arredondo*, 188 Wn.2d at 257. The trial court should exclude the evidence "[i]n doubtful cases." *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

B.       *The Trial Court Properly Admitted Banfield's Prior Convictions*

Under ER 404(b), prior acts of violence are admissible when they are relevant to prove an element of the crime. *Ashley*, 186 Wn.2d at 41. Here, to prove unlawful imprisonment, the State had to show that Banfield restrained KC. RCW 9A.40.040(1). "'Restrain' means to restrict a person's movements without consent and . . . in a manner which interferes substantially with

[their] liberty. Restraint is 'without consent' if it is accomplished by (a) physical force, intimidation, or deception." RCW 9A.40.010(6). Evidence of prior acts of domestic violence may be relevant to establish a lack of consent. *Ashley*, 186 Wn.2d at 41-42.

Banfield analogizes his case to *Ashley*, but that case does not advance his position. In that case, Ashley and Gamble dated and had children together before separating. *Id.* at 35. Years later, to avoid arrest for an unrelated matter, Ashley detained Gamble and the children in a bathroom, only releasing them when officers entered the residence. *Id.* at 36. The State charged Ashley with unlawful imprisonment (domestic violence) for detaining Gamble in the bathroom without her consent. *Id.* At trial, the court admitted ER 404(b) evidence of Ashley's prior domestic violence incidents against Gamble to prove he had restrained her through intimidation, despite the lack of any express threat. *Id.*

On appeal, Ashley challenged the admissibility of the ER 404(b) evidence. *Id.* at 40. The Supreme Court noted that the risk of unfair prejudice when admitting prior bad acts in domestic violence cases is very high, but held that the trial court correctly concluded that this type of evidence was "highly probative in assessing whether Ashley intimidated [his girlfriend,] such that she was restrained without her consent." *Id.* at 43. The Supreme Court concluded the domestic violence evidence was both material and relevant to decide whether Ashley acted without Gamble's consent and restrained her through intimidation. *Id.* at 42.

Here, as in *Ashley*, the State introduced ER 404(b) evidence regarding Banfield's prior domestic violence convictions against KC to show "lack of consent" for unlawful imprisonment and that Banfield "knowingly restrained [KC] without her consent." RP at 730. And like in

*Ashley*, the trial court ruled that the evidence was admissible for this purpose, acknowledging the risk of unfair prejudice but finding that the probative value outweighed any prejudicial effects.

Banfield and KC dated for around ten years and had a "rocky" relationship that involved much "drinking and . . . violence." RP at 241, 242. Despite this dynamic, KC did not leave Banfield because she loved him. KC testified that she was scared at the time of the incident. And an officer testified that KC told her "she was scared, didn't want any retaliation [from Banfield], and was scared that [Banfield] would kill her the next time." RP at 299. But at trial, KC did not recall what she told law enforcement during the incident. Therefore, but for that history of abuse, it is unlikely the State could have proved that Banfield restrained KC without her consent by intimidation. *See Ashley*, 186 Wn.2d at 45. Based on the violence of their prior relationship, the trial court reasonably concluded that the evidence was probative of whether KC feared Banfield. *Id.* This evidence helped the jury assess KC's state of mind—that is, whether she was restrained without consent because she was intimidated. *Id.*; RCW 9A.40.010(6). Thus, like in *Ashley*, the State established the "overriding probative value" of Banfield's prior convictions "because the evidence went directly to a necessary element of the crime." *See Ashley*, 186 Wn.2d at 45.

Banfield asserts "the use of the prior act evidence in this case is similar to the use disapproved of in *Ashley*, which was to establish [the victim's] credibility." Br. of Appellant at 41. But the State offered evidence of Banfield's prior acts of domestic violence to establish an element of the crime of unlawful imprisonment, not to show KC's credibility. So, though the State's written motion indicates that it sought to admit this evidence to help the jury assess KC's

credibility, the record does not reflect that the State actually offered Banfield's convictions for this purpose nor that the trial court admitted the evidence for this purpose. The trial court did not abuse its discretion in analyzing the admissibility of the ER 404(b) evidence.

Banfield argues the impact of the ER 404(b) evidence was far more prejudicial than probative. Banfield relies on *State v. Gunderson,* 181 Wn.2d 916, 337 P.3d 1090 (2014). In *Gunderson*, the State sought to introduce evidence of the defendant's prior acts of domestic violence to impeach its own witness. *Id.* at 920-21. Although the State's witness did not contradict herself or recant her earlier statements, the trial court admitted the ER 404(b) evidence on the ground that other evidence contradicted her account. *Id.*

Here, as in *Ashley*, the ER 404(b) evidence was relevant to prove an element of the crime charged—restraint without consent. *See* RCW 9A.40.010(6). And unlike in *Gunderson*, the trial court did not admit the ER 404(b) evidence for impeachment purposes. Thus, we hold that the trial court did not abuse its discretion in admitting evidence of Banfield's prior acts of domestic violence because they were relevant to the restraint element of the charge of unlawful imprisonment as a crime of domestic violence.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Banfield argues he received ineffective assistance of counsel because his attorney failed to object when (1) the State's witness opined that a photo associated with a text sent from a jail tablet was Banfield and (2) the State argued in closing that the text was an admission of a felony violation of a court order. We disagree.

A.      *Legal Principles*

A criminal defendant has a right to effective assistance of counsel at every critical stage of the proceeding.  U.S. CONST. amend. VI; WASH. CONST. art. I, § 22.  The Sixth Amendment and article I, section 22 of our state constitution protect a defendant's "right to appear and defend in person, to testify on [their] own behalf, and to confront witnesses against [them]."  *State v. Berube*, 171 Wn. App. 103, 114, 286 P.3d 402 (2012) (internal quotation marks omitted).

To succeed on an ineffective assistance of counsel claim, a defendant must show both deficient performance and resulting prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  Performance is deficient if it falls below an objective standard of reasonableness.  *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024).  We strongly presume that counsel's performance was effective.  *Id.* at 130.  To rebut this presumption, a defendant bears the burden of showing that there was no possible legitimate trial tactic that would explain counsel's performance.  *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

To demonstrate prejudice, a defendant must show a reasonable probability that, absent the deficient performance, the outcome of the trial would have differed.  *Bertrand*, 3 Wn.3d at 129.  It is not enough to merely show that errors had some conceivable effect on the outcome of the proceeding.  *Strickland*, 466 U.S. at 693.  If a claim of ineffective assistance of counsel fails to support a finding of either deficiency or prejudice, it fails, and we need not address both components of the inquiry.  *Id.* at 697.

If a defendant centers their claim of ineffective assistance of counsel on their attorney's failure to object, then they must show that the objection would likely have succeeded. *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019).

B.     *Banfield's Ineffective Assistance of Counsel Claim Fails*

Banfield contends that Captain Moses's testimony was improper lay opinion testimony under ER 701 because Captain Moses did not know what Banfield looked like and did not have "special knowledge regarding identification of the person depicted in the photo." Br. of Appellant at 35-36. Relatedly, Banfield argues that no reasonably prudent attorney would fail to object to a text message that amounts to a confession to the felony violation of a court order charge when the identity of the message sender could be challenged.

Even if we presume without deciding that defense counsel performed deficiently by not objecting in both instances, Banfield cannot show prejudice where overwhelming evidence exists that he committed felony violation of the no-contact order.[5] Among other things, officers testified that at KC's front door, they heard a physical altercation ensuing between at least two people inside the apartment and then heard a distressed female voice yelling "[h]elp me" and "[h]e won't let me go." RP at 345-47. Witnesses then advised officers that a male had jumped from KC's balcony. They eventually found Banfield laying in bushes, 175 feet away from the apartment complex, in violation of the active Cowlitz County Superior Court no-contact order.

---

[5] Banfield argues prejudice only in the context of his felony violation of a court order conviction. Therefore, we do not address how the outcome of the trial would have differed with regard to Banfield's other convictions. RAP 10.3(a)(6); *State v. Coleman*, 6 Wn. App. 2d 507, 516 n.34, 431 P.3d 514 (2018) (stating we need not consider issues that are not argued).

*See* Ex. 3 (expressly prohibiting Banfield from knowingly entering, remaining, or coming within 1,000 feet of KC's residence).  Furthermore, officers testified that KC told them Banfield had hit her face, and KC testified that Banfield had held her down, poured alcohol down her throat, and hit her face.  Because overwhelming evidence exists that Banfield violated the no-contact order, he cannot show prejudice.  Thus, we hold that Banfield's ineffective assistance of counsel claim fails.

### IV.  LEGAL FINANCIAL OBLIGATIONS

Banfield argues, and the State concedes, that the VPA should be stricken from his judgment and sentence.  We accept the State's concession and remand for the trial court to strike the VPA.

Banfield also argues that the DVA should be stricken.  The State asserts that the DVA should remain because there is no showing the court abused its discretion in imposing it.  We agree with the State.

RCW 10.99.080(1) provides in part that a trial court "*may* impose a penalty of one hundred dollars, plus an additional fifteen dollars on any adult offender convicted of a crime involving domestic violence" (emphasis added).  While not required, courts are "encouraged to solicit input from the victim or representatives for the victim in assessing the ability of the convicted offender to pay the penalty, including information regarding current financial obligations, family circumstances, and ongoing restitution."  RCW 10.99.080(5).

At sentencing, the trial court waived the jury demand fee and DNA fee but imposed the DVA.  Banfield contends that the trial court abused its discretion by imposing the DVA because

the court "appears to have incorrectly believed that the DV penalty is mandatory." Br. of Appellant at 50. The record does not support Banfield's contention. The trial court acted within its discretion in imposing the DVA. Thus, we affirm the DVA.

## V.  STATEMENT OF ADDITIONAL GROUNDS

In his SAG, Banfield claims "judicial misconduct for bias for violating his due process rights" and ineffective assistance of counsel. SAG at 1 (capitalization omitted).

As for Banfield's judicial misconduct claim, he asserts that the trial judge had "contempt and dislike" for him. SAG at 1. He also asserts that "[a]t each and every interaction" between him and the trial judge, the judge "maligned and made no attempt to hide her partiality for . . . Banfield and especially during trial(s) when the Jury was present." SAG at 3. Banfield provides minimal argument and context to support his alleged error of judicial misconduct. Though Banfield is not required to cite to the record or authority, he must still "inform the court of the nature and occurrence of alleged errors." RAP 10.10(c); *see State v. Thompson*, 169 Wn. App. 436, 493 n.195, 290 P.3d 996 (stating we are "not obligated to search record in support of claims made in [a SAG]."). Thus, Banfield's alleged error is not reviewable under RAP 10.10(c).[6]

Relatedly, Banfield claims the trial judge exhibited bias against him by admitting his prior convictions at trial. SAG at 4. But as explained above, the trial court properly admitted

---

[6] Banfield states that when he "obtains his requested transcripts of the numerous 'intermingled' hearings[] he can show on the record . . . the numerous instances of bias." SAG at 4. But we do not address claims on direct appeal that depend on evidence outside the record on appeal. *State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995). Moreover, issues involving facts outside of the record are properly raised in a personal restraint petition, not in a SAG. *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345.

evidence of Banfield's prior acts of domestic violence because they were relevant to the restraint element of the charge of unlawful imprisonment as a crime of domestic violence. Therefore, where the trial court had a proper basis to admit Banfield's prior convictions, Banfield fails to show that this decision was based on bias or some other invalid basis.

As for Banfield's ineffective assistance of counsel claim, he asserts that his trial attorney "made no effort to consolidate or combine his two active cases," "ma[de] no effort for a global resolution," and "fail[ed] to share plea agreement(s)" with him. SAG at 4 (capitalization omitted). Beyond references in the record that Banfield had two active cause numbers, "the nature and occurrence" of the alleged error is unclear. RAP 10.10(c). Banfield's claim also appears to rely upon evidence outside the appeal record. *Alvarado*, 164 Wn.2d at 569. Therefore, we do not review this claim.

We hold that Banfield's SAG claims are not reviewable or lack merit.

## CONCLUSION

We hold that the trial court did not violate Banfield's right to be present at trial, Banfield's ineffective assistance of counsel claim fails, the trial court did not abuse its discretion in admitting evidence of Banfield's prior acts of domestic violence, the trial court did not err in imposing the DVA but the VPA should be stricken, and Banfield's SAG claims are not reviewable or lack merit.

We affirm Banfield's convictions but remand to the trial court to strike the VPA from his judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Maxa, P.J.

Price, J.